# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOHN BROWN,

        Defendant-Appellant.

UNPUBLISHED
November 27, 2018

No. 338113
Wayne Circuit Court
LC No. 16-008223-02-FC

Before: JANSEN, P.J., and K. F. KELLY and BORRELLO, JJ.

PER CURIAM.

A jury convicted defendant of second-degree murder, MCL 750.317; two counts of assault with intent to murder, MCL 750.83; felon in possession of a firearm (felon-in-possession), MCL 750.224f; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to concurrent prison terms of 30 to 50 years for the second-degree murder and assault with intent to murder convictions and three to five years for the felon-in-possession conviction, and to a consecutive term of two years' imprisonment for the felony-firearm conviction. Defendant appeals as of right. We affirm but remand for the ministerial purpose of correcting the judgment of sentence.

## I. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the evidence was insufficient to support his convictions stemming from the death of Darnell Christmon and the injuries suffered by Darius Christmon and Kenneth Delbridge during a shooting in Detroit, Michigan on June 29, 2016. We disagree.

Whether sufficient evidence was presented by the prosecution to support a conviction is an issue that this Court will review de novo. *People v Mikulen*, 324 Mich App 14, 20; ___ NW2d ___ (2018). In reviewing the sufficiency of the evidence, this Court must view the evidence "in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012). This Court will not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). Circumstantial evidence and the reasonable inferences that arise from such evidence can provide sufficient proof of the elements of a crime. *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999).

"[T]he elements of second-degree murder are as follows: (1) a death, (2) the death was caused by an act of the defendant, (3) the defendant acted with malice, and (4) the defendant did not have lawful justification or excuse for causing the death." *People v Smith*, 478 Mich 64, 70; 731 NW2d 411 (2007). "The elements of assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999). MCL 767.39 provides, in pertinent part:

> Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.

To support defendant's convictions pursuant to an aiding or abetting theory, the prosecutor had to show that (1) defendant or some other person committed the crimes charged, (2) defendant performed acts or offered encouragement that assisted in the commission of the crimes, and (3) "the defendant intended the commission of the crime[s] or had knowledge that the principal intended [their] commission at the time that [the defendant] gave aid and encouragement." *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (quotation marks and citation omitted). "An aider and abettor's state of mind may be inferred from all the facts and circumstances." *Carines*, 460 Mich at 757 (quotation marks and citation omitted). In determining whether sufficient evidence was presented to establish that defendant aided and abetted the criminal offenses at issue, relevant factors include "a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *Id*. at 757-758. "Mere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to establish that a defendant aided or assisted in the commission of a crime." *People v Norris*, 236 Mich App 411, 420; 600 NW2d 658 (1999). Additionally, identity is a necessary element that the prosecution must establish in every case. *People v Oliphant*, 399 Mich 472, 489; 250 NW2d 443 (1976).

Contrary to defendant's assertions on appeal, the record evidence amply established his culpability as one of the shooters that killed Darnell and seriously injured Delbridge and Darius. Moreover, the record does not support defendant's allegation that he was merely present at the shooting. Instead, the record evidence established that Delbridge and Isis Allen had an existing relationship where Delbridge would act as an intermediary between Allen and sellers of Oxycodone in Detroit. According to the record, Allen would drive up to Detroit from Cincinnati, Ohio to purchase the Oxycodone and provide Delbridge with the money to facilitate the purchase. On June 27, 2016, Delbridge attempted to purchase Oxycodone for Allen from a seller that he was not familiar with, but the transaction was not completed after Delbridge was robbed of the $10,000 in purchase funds. Following the robbery, Allen called defendant, her boyfriend, who was very upset about the loss of the $10,000. Delbridge next saw Allen during the afternoon of June 29, 2016, when she arrived at his house in the same car she drove during previous drug transactions. There were three armed men on the porch, one of whom Delbridge identified as defendant. Defendant was hovering over Darnell with a firearm. Darnell went into the house, followed at gunpoint by one of the men and by Delbridge and defendant. Darius subsequently arrived and observed the men and Allen inside the house before starting to go

upstairs. Darnell became increasingly agitated and, after Delbridge tried to calm Darnell down, the armed men, one of which was defendant, opened fire and shot Darnell multiple times. Delbridge attempted to crawl under the bed and saw defendant and another gunman, who was wearing a navy blue hoody, fire shots at him. Delbridge suffered ten gunshot wounds, and Darnell died from multiple gunshot wounds. Darius was shot from behind as he traversed the stairs.

Delbridge identified defendant and Allen as being at the scene of the shooting. Moreover, the parties stipulated at trial that defendant and Allen were involved in an intimate relationship. Delbridge further testified that defendant was one of the armed men who shot him and Darnell. Darius saw another man in the house with Allen just before he was shot while going up the stairs, and Darius's girlfriend saw a man run from the house with Allen just after Darius was shot. The cellular telephone evidence presented by the prosecution placed defendant and Allen in Detroit in the time leading up to the shooting. Both defendant and Allen were also seen on surveillance footage from the St. Regis Hotel in Detroit shortly before the shooting. The cellular telephone evidence also placed defendant in the vicinity of the shooting at 19691 Packard in Detroit contemporaneously with and after the shooting. One of defendant's cellular telephones seized by the police after the shooting revealed that defendant was searching the internet for information regarding the shooting in the time period following the commission of the crimes. Viewed in the light most favorable to the prosecution, *Reese*, 491 Mich at 139, the direct and circumstantial evidence was such that a trier of fact could find that defendant was armed when he went to Delbridge's house on June 29, 2016 and was one of the shooters that killed Darnell and caused serious injuries to Darius and Delbridge.

## II. CELL PHONE TRACKING EVIDENCE

Defendant argues that the trial court abused its discretion by qualifying a police lieutenant as an expert in cellular telephone tracking and mapping and admitting his testimony regarding cell phone tracking. He discusses generally the law regarding the admissibility of expert testimony and, after noting that the lieutenant's testimony differed from the testimony of the defense expert with respect to the distance that cell phone signals can travel to connect with a tower, announces that the testimony was not admissible under MRE 702.[1] Defendant does not offer any analysis of the facts in this case to support his argument, nor does he discuss the trial

---

[1] MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

court's pretrial ruling that cellphone tracking evidence is admissible. Because defendant has not put forth a substantive legal argument to support the merits of this allegation of error, he has abandoned this argument. *People v Lopez*, 305 Mich App 686, 694; 854 NW2d 205 (2014).

Further, defendant did not object to the lieutenant's qualification as an expert, and he conceded at trial that the cellphone tracking evidence placed defendant in Detroit on June 29, 2016. Defendant's argument appears to suggest that the lieutenant stated that he could determine a cell phone's exact location. However, the lieutenant did not state that he could pinpoint the exact location of a cell phone. Rather, he opined that the cell phone tower a phone accessed during a call provided an approximate location for the device. Again, defendant did not dispute that he was in the approximate location of the shooting. And, the lieutenant acknowledged the defense expert's testimony that a cell phone signal could possibly reach a cell tower up to 21.75 miles away but testified that, in his experience with Sprint towers in the Detroit area, a cell phone typically accessed a tower that was within 1.5 miles, and rarely up to four miles away, as signals are impacted by a number of factors. He testified that tower use could change minute by minute during the same call. Defendant's expert acknowledged that "if there's a conglomeration of cellphone towers closer to the signal the phone is not likely to go 21 miles to find a tower." The defense expert testified that there is no way to absolutely determine that a call will go to the nearest cell tower, but it "more likely will go to a closer tower than a tower further away."

Defendant has not directed this Court's attention to any Michigan cases where cell phone tracking evidence presented by an expert has been rejected. The lieutenant's testimony, which was based on the cell phone records as well as his specialized knowledge regarding Sprint cell phone towers, helped the jury understand information at issue in this case that an average juror would not have previously known. See *People v Kowalski*, 492 Mich 106, 121; 821 NW2d 14 (2012) (to be admissible under MRE 702 the proffered testimony must involve a matter "that is beyond the common understanding of the average juror."). Thus, he provided reliable testimony that assisted the jurors in understanding how defendant's cell phone records placed him (or his phone) in the area of the shooting. Defendant has failed to demonstrate that the trial court abused its discretion by admitting the evidence where there exists ample justification for the trial court's ruling. *People v Murray*, 234 Mich App 46, 52; 593 NW2d 690 (1999).

## III. PROSECUTOR'S CONDUCT

Defendant argues that his due process right to a fair trial was violated when the prosecutor failed to correct Delbridge's false testimony regarding his identification of defendant in a photo lineup while he was in the hospital following the shooting. We review de novo a claim that due process was violated. *People v Smith*, 498 Mich 466, 475; 870 NW2d 299 (2015). We also review issues of prosecutorial misconduct de novo to discern whether a defendant was denied a fair and impartial trial. *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013).

"It is well settled that a conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment." *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009). When the prosecutor knows that a witness has testified falsely, the prosecutor has an affirmative duty to correct the testimony. *Smith*, 498 Mich at 476. "[I]t is the *effect* of a prosecutor's failure to

correct false testimony that is the crucial inquiry for due process purposes." *Id*. (citation and quotation marks omitted). Thus, the focus is on the fairness of the trial and not the culpability of the prosecutor. *Aceval*, 282 Mich App at 390. "A prosecutor's capitalizing on the false testimony, however, is of particular concern because it reinforce[s] the deception of the use of false testimony and thereby contribute[s] to the deprivation of due process." *Smith*, 498 Mich at 476 (citation and quotation marks omitted). "If a conviction is obtained through the knowing use of perjured testimony, it must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Aceval*, 282 Mich App at 389 (citation and quotation marks omitted).

Delbridge was hospitalized when officers went to his room to interview him on June 30, 2016. He was unable to talk and communicated by writing his answers on a piece of paper. He recalled identifying Allen's photograph and placing a circle and his initials on the photograph. He testified that there was "a lot going on" when he was in the hospital and he could not "really remember what I did as far as when I identified John Brown because they [the police] came numerous of [sic] times." He then testified that, while he was in the hospital, he was able to identify defendant from a series of photos shown to him by police. The prosecutor asked Delbridge to whom he had made the identification, but Delbridge could not recall. The prosecutor twice pointed out to Delbridge that he had not placed a circle or his initials on defendant's photographs. Delbridge responded as follows: "No. I refused to circle and initial because [the police officer] had showed me so many so I picked those out of the ones that looked familiar to me but I refused to initial them until I got off the medication that I was on." The trial court then interrupted the prosecutor's direct examination and adjourned the trial for the day.

Outside the presence of the jury, defense counsel accused Delbridge of committing perjury and suggested that the prosecution was aware that Delbridge was giving false testimony. The prosecutor concedes that Delbridge testified at trial in a manner that was inconsistent with his testimony at an earlier hearing. However, as the prosecutor points out, there is no indication from the record that the prosecutor attempted to conceal the contradictions in the testimony. Instead, a review of the record supports the prosecutor's contention at trial that he was questioning Delbridge's recollection of his identification at the hospital when the court adjourned the trial for the day. In any event, the record reflects that the prosecution, in accordance with its affirmative duty, exposed Delbridge's inconsistent statements to the jury after trial resumed. *Smith*, 498 Mich at 476. After a discussion regarding which portions of Delbridge's testimony from an earlier hearing the prosecutor would use to impeach Delbridge, the prosecutor continued his direct examination of Delbridge at trial.[2] Specifically, the prosecutor compared Delbridge's testimony from the day before at trial to his prior testimony at the earlier hearing and, after reading the pertinent questions and Delbridge's answers from the earlier hearing, asked Delbridge whether his testimony at the earlier hearing was truthful. Delbridge responded, "Yes[.]" The prosecutor also presented the testimony of Detective Douglas Williams, who

---

[2] Defense counsel was a part of this discussion, and at the conclusion of the discussion agreed that it would be appropriate for the prosecutor to use leading questions when questioning Delbridge regarding his prior testimony at an earlier hearing.

confirmed that Delbridge did not identify defendant at the hospital as a participant in the shooting. During subsequent cross-examination by defense counsel, Delbridge stated that he could not identify defendant while in the hospital, and that his earlier testimony at trial that he could do so was a "misunderstanding." Therefore, where the record reflects that the prosecution undertook concerted efforts to correct the challenged testimony, we are not persuaded that defendant was denied due process and a fair trial.

## IV. SURVEILLANCE VIDEO TESTIMONY

Defendant argues that a police sergeant's unchallenged testimony identifying defendant as a person in a hotel security surveillance video invaded the province of the jury and that admission of the testimony was plain error. We disagree.

An unpreserved evidentiary issue is reviewed for plain error affecting the defendant's substantial rights. *Carines*, 460 Mich at 763-764. "Substantial rights are affected when the defendant is prejudiced, meaning the error affected the outcome of the trial." *People v Jones*, 297 Mich App 80, 83; 823 NW2d 312 (2012).

At trial, the parties stipulated to the admission of the DVD that contained the surveillance video of the St. Regis Hotel and, as the video was being played for the jury, the police sergeant pointed out where defendant appeared in the video. In *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013), this Court recognized that it is impermissible for a witness to express an opinion on whether the defendant is guilty or innocent of the charged offenses. However, this Court rejected the defendant's argument that a police officer's testimony identifying individuals in still-frame photographs as the same individuals in the surveillance video from which the still photographs were taken was erroneously admitted as invading the province of the jury. *Id*. at 49, 53. This Court's ruling was based on its conclusion that the police officer in *Fomby*, unlike a police officer in *United States v LaPierre*, 998 F2d 1460, 1465 (CA 9, 1993), did not expressly identify the defendant. *Fomby*, 300 Mich App at 52-53. Conversely, in *LaPierre*, a police officer testified that the defendant was the individual seen in surveillance photographs from a bank that had been robbed. *LaPierre*, 998 F2d 1465; *Fomby*, 300 Mich App at 52. The *Fomby* Court recognized *LaPierre* as standing for the proposition that whether the defendant is the person in a surveillance video is a question best reserved to the jury. *Id*; see also *United States v Rodriquez-Adorno*, 695 F3d 32, 40 (CA 1, 2012) (holding that when a witness is no better situated than the jury to make an identification from a video or photograph, the testimony is inadmissible under FRE 701).

As an initial matter, the present case is entirely distinguishable from both *Fomby* and *LaPierre*. Notably, in this case, defense counsel conceded during opening arguments that defendant was in Detroit at the St. Regis Hotel with Allen on June 29, 2016 and that defendant lied to the Cincinnati police when he said he was not in Detroit. Similarly, in his closing argument, defense counsel conceded that defendant was at the St. Regis Hotel because he was having an affair with Allen. Even accepting defendant's contention that the testimony invaded the province of the jury and that it was inadmissible, we disagree that the admission of the evidence in any manner affected the outcome of the trial. The key fact in dispute at trial was not whether defendant was at the hotel, but whether he was at the scene of the shooting. Put simply, the testimony with respect to the hotel surveillance video did not place defendant at the scene of

the shooting or identify him as one of the shooters.  Under these circumstances, we are satisfied that the testimony at issue did not affect the outcome of defendant's trial.

We affirm defendant's convictions but remand for the ministerial purpose of correcting the judgment of sentence. *People v Avant*, 235 Mich App 499, 521; 597 NW2d 864 (1999).  The judgment of sentence incorrectly reflects that defendant was convicted of all offenses following a plea of guilt.  However, the judgment of sentence should be corrected to state that defendant was convicted of all offenses following a jury trial.  We do not retain jurisdiction.

/s/ Kathleen Jansen
/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello