*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 20, 2021

Plaintiff-Appellee,

v

No. 345852
Genesee Circuit Court
LC No. 17-041898-FC

DAMARIUS MONTRAIL GREEN,

Defendant-Appellant.

Before: SHAPIRO, P.J., and JANSEN and BECKERING, JJ.

PER CURIAM.

Defendant appeals as of right his convictions, following a jury trial, of second-degree murder, MCL 750.317, armed robbery, MCL 750.529, second-degree arson, MCL 750.73, fourth-degree arson, MCL 750.75, felon in possession of a firearm, MCL 750.224f, and four counts of possession of a firearm during the commission of a felony ("felony-firearm"), MCL 750.227b. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to concurrent prison terms of 60 to 90 years for the second-degree murder conviction and 40 to 60 years each for the armed robbery, arson, and felon-in-possession convictions, to be served consecutively to four concurrent prison terms of two years each for the felony-firearm convictions. We affirm.

## I. BACKGROUND

Defendant's convictions arise from the death of Michael Stringer and events surrounding Stringer's death. Stringer was last seen alive on the evening of December 4, 2016. In the early morning hours of December 5, 2016, a fire was reported at a house on West Downey Avenue in Mt. Morris Township, which belonged to the mother of codefendant Leonardo Johnson, Jr. The police found blood inside and outside the house, but did not find a body. At approximately 5:00 p.m. that evening, the police found a Chevy Cruze that had been burned and parked behind an abandoned house in Flint. The vehicle was towed away and stored at a secure impound lot. Later in December 2016, the police received information that Stringer had been driving a Chevy Cruze on the night he disappeared. After learning that an abandoned Chevy Cruze had been recovered

-1-

earlier that month, the police located the vehicle at the impound lot and then found Stringer's deceased body inside the trunk.

An autopsy revealed that Stringer died from multiple gunshot wounds. The prosecutor's theory at trial was that Stringer went to Johnson's mother's house intending to buy marijuana, that defendant and Johnson planned to rob him, and that Stringer was shot during the robbery. Afterward, defendant and Johnson placed Stringer's body in the trunk of his car and set the house on fire to cover up evidence of the shooting. Defendant and Johnson then went to the home of a mutual friend, Johnnisha Williams, where they changed their clothing and defendant showered, and then defendant drove Stringer's car, containing his body, to Flint, where it was left and set on fire. After these events, defendant fled the state.

Defendant and Johnson were tried jointly, before separate juries. Midtrial, Johnson entered into a plea agreement whereby he pleaded guilty of a reduced charge of second-degree murder, agreed to a minimum sentence of 22-1/2 years, and also agreed to testify truthfully against defendant. At trial, Johnson testified that he arranged to meet with Stringer at his mother's house to sell him marijuana. Before Stringer arrived, defendant came to the house and the two then decided to rob Stringer. When Stringer arrived, Johnson met him outside while defendant waited in a bedroom. Johnson brought Stringer into another bedroom and told him to wait while Johnson went to the basement to get the marijuana. According to Johnson, while he was downstairs, he heard a gunshot. When Johnson returned upstairs, he saw that Stringer had been shot in the leg. Johnson claimed that defendant then shot Stringer three more times in the face, wrapped his body in some blankets, dragged it outside, and placed the body in the trunk of Stringer's car. Defendant then set the house on fire to destroy evidence of the shooting. Johnson admitted that the gun used to shoot Stringer belonged to him, but said that he allowed defendant to use it to commit the planned robbery.

According to Johnson, the two then drove to the home of Johnnisha Williams where defendant showered and they changed their clothing. At trial, Williams corroborated this testimony. Williams also testified that she noticed blood on defendant's shoes when he arrived. Johnson then borrowed Williams's car and followed defendant, who was driving Stringer's car, to an abandoned house in Flint, where they left Stringer's car and set it on fire. When the police later searched Stringer's car, they found a plastic bag with three sets of clothing. Photos recovered from defendant's and Johnson's Facebook accounts showed defendant wearing distinctive clothing that matched the clothing recovered from Stringer's car. Forensic analysis of a pair of pants recovered from Stringer's car also revealed the presence of DNA that matched defendant's DNA profile.

Defendant testified at trial and denied any involvement in the charged offenses. He could not remember what he did on December 5, 2016, but denied that he was at Johnson's mother's house. He remembered going to Williams's house with blood on his shoes and to shower, but claimed it was a different day, after he had attended a party. He also stated that he often swapped clothing with his friends, including Johnson, so it would not be unusual to find his DNA on clothing that Johnson wore.

After defendant was convicted, Johnson sent a letter to defendant's counsel, advising him that defendant was not involved in this offense and that Johnson committed it by himself. Defendant moved for a new trial on the basis of this newly discovered evidence. After conducting

an evidentiary hearing at which Johnson and another witness testified, the trial court found that Johnson's recanting testimony was not credible, and accordingly, denied defendant's motion for a new trial. This appeal followed.

## I. DEFENDANT'S BRIEF ON APPEAL

### A. SPEEDY TRIAL

Defendant first argues that the trial court erred by denying his motion to dismiss on the ground that his right to a speedy trial was violated. We disagree. Whether a defendant's right to a speedy trial was violated is a question of constitutional law that this Court reviews de novo. *People v Rivera*, 301 Mich App 188, 193; 835 NW2d 464 (2013).

A defendant's right to a speedy trial is guaranteed by both the federal and state constitutions, US Const, Am VI; Const 1963, art 1, § 20. See also MCL 768.1; MCR 6.004(A). The time for evaluating a speedy-trial claim begins with the date of the defendant's arrest, but there is no fixed number of days before trial must begin. *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006). In determining whether a defendant has been denied the right to a speedy trial, courts are required to balance the following four factors: (1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant. *Id*. at 261-262. Where there is a delay of more than 18 months, prejudice is presumed and the burden shifts to the prosecution to show that there was no injury to the defendant. *Id*. at 262. When the delay is less than 18 months, the defendant must prove that he has suffered prejudice. *Rivera*, 301 Mich App at 193.

The delay between defendant's arrest and the start of trial in this case was approximately 16-1/2 months. Although significant, the case was more complex because it involved two different crimes scenes, both of which also involved fires, making it more difficult to collect and preserve evidence, and a large number of items had to be forensically examined. When a case is more complex, more delay is tolerated. *People v Cooper*, 166 Mich App 638, 655; 421 NW2d 177 (1987).

When assessing the reasons for the delay, each period of delay should be examined and attributed to either the prosecution or the defendant. *People v Waclawski*, 286 Mich App 634, 666; 780 NW2d 321 (2009). The delay in this case was primarily attributable to having to wait for the crime laboratory to forensically analyze many items of evidence collected in this case. Although such delay may be attributed to the prosecution, it should be given a neutral tint and assigned only minimal weight. See *Williams*, 475 Mich at 263 (delays inherent in the court system are to be given a neutral tint and assigned only minimal weight in determining whether a defendant was denied a speedy trial).

Defendant did timely assert his right to a speedy trial in the trial court by moving for dismissal on that basis.

Finally, because the delay was less than 18 months, the burden was on defendant to establish that he was prejudiced by the delay. There are two types of prejudice: (1) prejudice to the defense, and (2) prejudice to the person. *Id.* at 264. Prejudice to the defense might take the form of key witnesses no longer being available. *People v Collins*, 388 Mich 680, 694; 202 NW2d

769 (1972). Prejudice to the person "would take the form of oppressive pretrial incarceration leading to anxiety and concern." *Id.* Prejudice to the defense is the more serious concern, and a defendant might be able to withstand a longer delay if the impact is personal only. *Williams*, 475 Mich at 264.

Defendant admits that he cannot show prejudice to his defense by the delay. Defendant testified in his defense and denied any involvement in the charged offenses. Although he could not remember where he was at on the night Stringer was killed, he was sure that he was not at Johnson's mother's house. A defendant's mere loss of memory is generally insufficient to establish prejudice. See *People v Wyngaard*, 151 Mich App 107, 111; 390 NW2d 694 (1986). Moreover, defendant's inability to recall events was also impacted by his decision to leave Michigan after Stringer was killed. He did not return to this state until April 2017. Defendant does not otherwise explain how the delay impacted his defense.

Defendant argues that he suffered prejudice to his person because of the significant stress and anxiety he experienced due to his lengthy incarceration while awaiting trial. As the prosecution points out, however, defendant was not incarcerated solely because of this offense. Rather, he left the state in violation of his parole and, after he was apprehended, he was detained on a parole hold. Thus, any disruption to defendant's personal liberty and any increased stress and anxiety from his incarceration in jail was not attributable solely to the delay in trying this case.

On balance, despite defendant's timely assertion of his right to a speedy trial, considering the length of the delay in the context of the complexities of the case, the fact that the delay was mostly attributable to a need to have a large number of evidentiary items forensically examined, and defendant's failure to establish any prejudice to his defense because of the delay, the trial court did not err by ruling that defendant's right to a speedy trial was not violated.

## B. MISTRIAL

Next, defendant argues that the trial court erred by denying his motion for a mistrial after Johnson decided to plead guilty and testify against defendant, which in turn prompted prosecution witness Johnnisha Williams to give a new statement and announce that her prior testimony was untruthful, thereby permitting the prosecutor to recall Williams to correct her prior testimony. We review a trial court's decision to deny a motion for a mistrial for an abuse of discretion. A court abuses its discretion when its decision falls outside the range of principled outcomes. *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014).

First, with regard to Johnson's decision to plead guilty and testify, that was a decision he made midtrial. Before then, neither defendant nor the prosecution could have anticipated that Johnson would plead guilty and testify. This situation did not involve an irregularity in the trial, but rather the emergence of testimony that was unanticipated. It came as much of a surprise to the prosecution as it did to defendant. To avoid any unfair prejudice to defendant from this change of events, the trial court adjourned the trial on August 23, 2018, to August 29, 2018, to give defendant time to review Johnson's plea testimony and his prior statements and be able to respond to this new evidence.

Likewise, it was Johnson's decision to testify and provide a new statement that prompted Williams to change her prior statement and admit that she had not been truthful in her prior testimony. It is not uncommon for witnesses to not always testify as anticipated, and it is sometimes necessary to recall witnesses to clarify or change their testimony. Moreover, it is inconsistent with due process for a prosecutor to allow false testimony from a witness to stand uncorrected. *People v Smith*, 498 Mich 466, 475; 870 NW2d 299 (2015). When a prosecutor becomes aware that a witness has testified falsely, the prosecutor has an affirmative duty to correct the testimony. *Id.* at 476. Therefore, after Williams revealed that her prior testimony was not truthful, an appropriate response was not to declare a mistrial, but rather to allow her to be recalled to correct her prior testimony. The trial court took steps to minimize any prejudice to defendant by waiting until Williams's new statement could be transcribed and by providing defense counsel with an opportunity to review the newly transcribed statement before Williams was recalled.

Defendant attempts to characterize these events as a product of the prosecution's misconduct in waiting until trial was underway to complete its investigation of the case, and to provide necessary discovery materials. However, codefendant Johnson's Fifth Amendment privilege against self-incrimination prohibited the prosecution from compelling him to testify. It was not until he agreed, during midtrial, to waive his rights, plead guilty, and testify against defendant that his testimony became available. In addition, Williams had already been interviewed and her statement provided to defendant before trial. It was not until after Johnson decided to plead guilty that Williams changed her prior statement and announced that her prior testimony was not truthful. When that occurred, the prosecutor acted promptly to ensure that her new statement was recorded and that a transcript was provided to the defense, consistent with the prosecution's duty to take corrective action upon learning that prior testimony was false. Consequently, there was no misconduct by the prosecutor.

For these reasons, the trial court did not abuse its discretion by denying defendant's motion for a mistrial and instead allowing a brief adjournment so that defendant would have time to review and respond to the new evidence.

## C. NEWLY DISCOVERED EVIDENCE

Defendant argues that the trial court erred by denying his motion for a new trial on the basis of newly discovered evidence in the form of codefendant Johnson's recanting testimony. This Court reviews a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion. *People v Johnson*, 502 Mich 541, 564; 918 NW2d 676 (2018). An abuse of discretion occurs when the court's decision falls outside the range of reasonable and principled outcomes. *Id.*

At an evidentiary hearing held on defendant's motion for a new trial, Johnson testified that he lied at trial about defendant's involvement in the charged offenses. Johnson claimed that he acted alone in shooting Stringer as part of his plan to rob Stringer, and that he alone disposed of Stringer's body and set both his mother's house and Stringer's car on fire. He also denied that Williams's testimony that both he and defendant stopped at her house and changed their clothes on the morning of the offense was truthful. The trial court also heard from an investigator who interviewed Johnson. The investigator explained that Johnson initially maintained that he committed the offense alone, but when informed that his new testimony could jeopardize his plea

deal, his story began to change. He explained that he wanted to help defendant, but also pointed his finger at defendant and even suggested that another person, who was already incarcerated for murder, should take the blame for this case. The trial court denied defendant's motion for a new trial on the basis of its finding that Johnson's recanting testimony was not credible. The court explained:

> To date, Co-Defendant Johnson has given eight different versions of what took place on December 5, 2016:
>
> > -at the time of arrest;
> > -correspondence written while in jail;
> > -plea;
> > -polygraph and post polygraph interview;
> > -trial;
> > -affidavit provided to Defendant's appellate counsel;
> > -interview with Defendant's appellate investigator;
> > -evidentiary hearing testimony
>
> Noteworthy is that three of the eight versions were testimonial; two were offered while his own appeal was pending and his appeal contradicts his most recent versions; he appears to capitulate his statement based on what he is seeking to accomplish.
>
> * * *
>
> In order to be successful, a defendant must satisfy all four criteria in *People v. Cress*, 468 Mich. 678 (2003). In this case, counsel agrees that only the fourth factor is in dispute. " . . .(4) the new evidence makes a different result probable on retrial." In order to make this determination, this Court must determine if the newly discovered evidence is credible. In reviewing the evidence, this Court cannot reach that conclusion. The different versions offered by Co-Defendant Johnson are not subtle differences. Each time a new version of events is offered, the story denigrates. This court is convinced that Co-Defendant Johnson will have a different version of events each time he has an opportunity to speak. But it is not merely the drastic differences in the different versions offered by Co-Defendant Johnson, it is also his credibility.
>
> Co-Defendant Johnson's testimony on February 25, 2020, is replete with his own admissions of dishonesty, his aptitude to "play people", and his claims to be honest "sometimes". Defendant is asking that this Court select April 11, 2019 (the date of the Affidavit he wrote and sent to Defendant's appellate counsel), as the date that Co-Defendant Johnson had his moment of clarity and was finally completely honest. What he said before, and what he said after, should be disregarded. This chronic, pathological dishonesty could not possibly make a different result at trial probable.

Bolstering the veracity of Co-Defendant Johnson's trial testimony is that he asserts in his own appeals that it was truthful. He will lie to benefit himself or perhaps his reputation on the street which he seems to feel is intact even during his incarceration.

To obtain a new trial on the basis of newly discovered evidence, a defendant is required to show that (1) the evidence itself, not merely its materiality, is newly discovered; (2) the newly discovered evidence is not cumulative; (3) the defendant could not, with reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence would probably cause a different result on retrial. *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003). Newly discovered evidence may be grounds for a new trial even if it could only be used for impeachment purposes, provided the defendant can satisfy the four-part test from *Cress*. *People v Grissom*, 492 Mich 296, 299-300; 821 NW2d 50 (2012). "[A] material, exculpatory connection must exist between the newly discovered evidence and significantly important evidence presented at trial." *Id.* at 300. The newly discovered evidence "may be of a general character and need not contradict specific testimony at trial," but it must make a different result probable on retrial. *Id.*

The parties do not dispute that defendant satisfied the first three prongs of the test from *Cress*. This issue is whether defendant established that Johnson's new testimony would probably cause a different result on retrial. In *Johnson*, 502 Mich at 566-567, the Court explained how a trial court should evaluate this fourth element of the *Cress* test:

> In order to determine whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible. [*Cress*, 468 Mich] at 692-693. In making this assessment, the trial court should consider all relevant factors tending to either bolster or diminish the veracity of the witness's testimony. See *id.* at 692-694. A trial court's function is limited when reviewing newly discovered evidence, as it is not the ultimate fact-finder; should a trial court grant a motion for relief from judgment, the case would be remanded for *retrial*, not dismissal. In other words, a trial court's credibility determination is concerned with whether a *reasonable juror* could find the testimony credible on retrial. See *Connelly v United States*, 271 F2d 333, 335 (CA 8, 1959) ("The trial court has the right to determine the credibility of newly discovered evidence for which a new trial is asked, and if the court is satisfied that, on a new trial, *such testimony would not be worthy of belief by the jury*, the motion should be denied.") (quotation marks and citation omitted; emphasis added).

In this case, the trial court's denial of defendant's motion for a new trial was predicated on its determination that Johnson's recanting testimony lacked credibility. Recanting testimony "has been traditionally regarded as suspect and untrustworthy" when offered as newly discovered evidence. *Johnson*, 502 Mich at 578 (citation omitted). While this Court reviews a trial court's decision to deny a new trial on the basis of newly discovered evidence for an abuse of discretion, the court's credibility assessments are reviewed for clear error. *Id.* at 564, 568. The record clearly supports the trial court's finding that Johnson's recanting testimony was not credible.

First, as the trial court observed, Johnson had provided multiple prior statements that presented varying versions of what he claimed occurred during the criminal episode. The court

also observed that Johnson typically changed his versions of events in a manner that tended to suit his interests at the time. While this history of inconsistent versions could also raise doubts about the veracity of Johnson's trial testimony, he was impeached at trial with his prior inconsistent statements, which allowed the jury to consider the impact of those statements in evaluating his credibility. Second, evidence was presented that Johnson was willing to provide a statement that exculpated defendant because he believed that his plea deal insulated him from any further consequences of his conduct, but when he was informed that his plea agreement could be in jeopardy if his trial testimony was found to be untruthful, he became less cooperative and his story began to change. Even at the evidentiary hearing, Johnson attempted to assert his Fifth Amendment privilege to avoid answering certain questions. Third, Johnson's most recent version of the events could not be verified through other corroborating evidence and, in fact, it conflicted with other evidence presented at trial, which instead supported Johnson's version of the events presented at trial. Although Johnson claimed that he acted alone and denied going to Williams's house on the morning of the offense, the police found a plastic bag that contained three sets of clothing inside Stringer's car. Some of the clothing inside the bag matched distinctive clothing that defendant could be seen wearing in photos posted on his Facebook account and was seen wearing on the day of the offense. Indeed, DNA obtained from a pair of pants found inside Stringer's car matched defendant's DNA profile. Moreover, Williams testified that defendant and Johnson both arrived at her home on the morning of the offense, that defendant had blood on his shoe, that defendant and Johnson both changed their clothes, that defendant showered, and that defendant and Johnson left together, with Johnson borrowing Williams's car. Williams's testimony supports Johnson's trial testimony, but conflicts with Johnson's recantation testimony.

Considering all relevant factors, including that recantation testimony is traditionally regarded as suspect and untrustworthy, Johnson's history of inconsistent statements, the circumstances surrounding Johnson's decision to provide the recantation testimony and the evidence that Johnson equivocated about whether his recanting statement was true, the lack of corroborative evidence supporting the recantation testimony, and the existence of other evidence that instead supported Johnson's trial testimony, the trial court did not clearly err by finding that Johnson's recanting testimony was not credible. Ample evidence supports that no reasonable juror could find Johnson's recanting testimony credible on retrial. Therefore, the trial court did not abuse its discretion by denying defendant's motion for a new trial.

## D. ACTUAL INNOCENCE

Defendant alternatively argues that he is entitled to relief under the freestanding "actual innocence" standard, which may be applicable to federal death-penalty cases as discussed in *Herrera v Collins*, 506 US 390, 417; 113 S Ct 853; 122 L Ed 2d 203 (1993). However, before a defendant can take advantage of this freestanding claim, he must first demonstrate that he is actually innocent. Without such a showing, we need not determine whether this freestanding federal standard should apply to state law cases in Michigan. Defendant's claim of actual innocence is predicated solely on Johnson's recanting testimony, which as explained earlier was found to be not credible. Moreover, other evidence, including Williams's testimony, the match between the distinctive clothing recovered from Stringer's vehicle and clothing that defendant was known to wear, and the presence of DNA on some of the recovered clothing that matched defendant's DNA profile, does not support defendant's claim of actual innocence. Therefore, defendant is not entitled to relief on the basis of this issue.

## II. DEFENDANT'S STANDARD 4 BRIEF

In a pro se brief, filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4, defendant argues that he is entitled to a new trial because the prosecutor violated his right to due process by allowing Johnson to present false testimony at trial. We disagree. Defendant concedes that this issue was not raised in the trial court, and therefore, is unpreserved. Thus, we review this issue for plain error affecting defendant's substantial rights. *People v Abraham,* 256 Mich App 265, 274-275; 662 NW2d 836 (2003).

As defendant correctly observes, a defendant's right to due process is violated when the prosecution allows false testimony from one of its witnesses to go uncorrected. *Smith*, 498 Mich at 475. Defendant has the burden of demonstrating that evidence or testimony was in fact false. See *People v Bass*, 317 Mich App 241, 272; 893 NW2d 140 (2016). In support of his claim that Johnson's trial testimony was false, defendant relies solely on the fact that Johnson had given several prior inconsistent statements before trial. While it is true that Johnson had given prior statements that were inconsistent with his trial testimony, that alone does not prove that his trial testimony was false. "Although an inconsistent prior statement may be a mechanism to impeach a witness's credibility at trial, it is not definitive evidence that the trial testimony is false." *Id*. at 275. Despite his prior inconsistent statements, Johnson's testimony at trial was consistent with other evidence discovered by the police during their investigation. Johnson was impeached at trial with his prior inconsistent statements and it was up to the jury to determine whether those statements affected the credibility of his trial testimony.[1] Defendant has not shown that the prosecutor had reason to know that Johnson's testimony at trial was false. Accordingly, defendant has not demonstrated any plain error in the introduction of Johnson's trial testimony.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Kathleen Jansen
/s/ Jane M. Beckering

---

[1] The jury was given instructions on factors to consider in evaluating Johnson's credibility, including the impact of his prior inconsistent statements, his admitted role as an accomplice, and the impact of his plea agreement. The jury was also allowed to consider whether Johnson's prior conviction affected his credibility.