MCCORMACK, J.
In this case, we consider whether the prosecution breached a duty to correct the substantially misleading, if not false, testimony of a key witness about his formal and compensated cooperation in the government’s investigation. Given the overall weakness of the evidence against the defendant and the significance of the witness’s testimony, we conclude that there is a reasonable probability that the prosecution’s exploitation of the substantially misleading testimony affected the verdict. See Napue v Illinois, 360 US 264, 271-272; 79 S Ct 1173; 3 L Ed 2d 1217 (1959). We therefore reverse the judgment of the Court of Appeals in part, vacate the defendant’s convictions, and remand this case to the Genesee Circuit Court for a new trial.
I. FACTS AND PROCEDURAL HISTORY
The defendant was charged with, among other things, armed robbery, MCL 750.529, and first-degree felony murder, MCL 750.316(l)(b), after the police *471 found known drug dealer Larry Pass, Jr., dead in Pass’s own home. At the defendant’s trial, two prosecution witnesses claimed to have been present when the defendant allegedly shot Pass. The first witness was codefendant Tarence Lard, who testified for the prosecution as part of a plea agreement for his part in the crime. The second witness was Mark Yancy, who maintained his innocence with respect to the shooting but admitted collecting Pass’s drugs, helping dispose of the murder weapon, and using cocaine with the defendant and Lard after the shooting. Yancy and Lard contradicted one another in important ways, although both testified that Yancy and the defendant had had a violent dispute over money in the weeks leading up to the murder. No other evidence connected the defendant to the crime or confirmed that he had ever been at the scene, and no murder weapon was ever recovered.
Yancy was a paid informant;[1] he had been compensated for his assistance in a Federal Bureau of Investigation (FBI) inquiry into Pass’s murder and a suspected criminal enterprise involving the defendant. This fact was made clear in a pretrial hearing, during which the prosecutor[2] specifically called the investigation’s FBI task force leader and informant coordinator, Special Agent Dan Harris, to address informant compensation in the case. Harris testified that Yancy was paid for his cooperation relating to “the Larry Pass *472 homicide [,] which was information against Mr. Lard and Mr. Smith [the defendant].”[3]
At trial, however, the fact and extent of Yancy’s participation in the investigation that lead to the prosecution of the defendant and the compensation Yancy received for it was never made known to the jury. On the contrary, Yancy testified that he was not paid for his cooperation in relation to “this case,” i.e., the prosecution of the defendant for Pass’s murder. The topic first arose during direct examination, during which Yancy admitted in response to the prosecutor’s question that he had been “paid by a federal agency for [his] cooperation.” Neither the prosecutor’s question nor Yancy’s answer tied his cooperation to his involvement in the investigation of the defendant as the prime suspect in Pass’s murder. In order to avoid linking Yancy’s compensated cooperation to the investigation and prosecution of the defendant, the prosecutor carefully limited her subsequent questions to whether he was specifically paid for the testimony he was giving, which Yancy denied.[4] By itself, such cautious presen *473 tation of testimony might not have been problematic because the prosecution was careful not to elicit outright false testimony. But then Yancy took this denial further during cross-examination:
[Defense Counsel]: Do you deny — first of all, it sounds like you agreed that you were paid $4,500 for cooperating with law enforcement, correct?
[Yancy]: Correct.
[Defense Counsel]: But you deny that it was wdth regards to this case, correct?
[fancy]: Correct. [Emphasis added.]
The prosecutor revisited the topic during redirect examination, again limiting her question to whether Yancy had been paid for his “testimony’ in particular. Yancy again denied being compensated:
[Prosecutor]: Okay, and just so we’re clear, you were not paid to testify in this case, correct?
[Yancy]: Correct.
*474 Four times, then, Yancy denied having been paid in connection with the defendant’s case—specifically, that he had not been compensated for his testimony at the defendant’s trial and also that he had not been otherwise compensated for “cooperating” “with regards to this case.” Clearly, the jury could have interpreted this statement to indicate that Yancy had never been paid for his involvement with the investigation of the Pass homicide, not merely that the Genesee County Prosecuting Attorney’s office had not compensated him for “testimony” or cooperation with the defendant’s formal prosecution. The latter point might have been true; the former point was plainly misleading and likely untrue, as the prosecutor well knew, having elicited Harris’s testimony at the pretrial hearing. This former point, however, was never corrected or clarified at trial, nor was the true nature or extent of Yancy’s participation or compensation as an informant put before the jury. Rather, the prosecutor exploited the potential confusion Yancy’s testimony created by reminding the jury of Yancy’s denials during closing argument, cementing the false notion that Yancy had only been paid for his cooperation in other cases, and attempting to advance his credibility as a result of that fact:
Mark Yancy was here, ladies and gentlemen, and he talked to you about [sic] he wasn’t charged in this homicide, and that he admitted he was in the house at the time of the homicide, and that he got the cocaine, and gave it to Lard and the defendant. He told you he did not get consideration on this case for testifying, that he got consideration on other cases that the task force was involved with. [Emphasis added.]
The jury found the defendant guilty of armed robbery and felony murder, but acquitted him of the other charges. On June 30, 2011, the defendant was sentenced as a fourth-offense habitual offender to life in *475 prison for the murder conviction and to 20 years, 10 months to 35 years for the armed-robbery conviction. The defendant appealed and, among other issues, argued that the prosecution’s failure to correct Yancas false testimony violated his right to due process and denied him a fair trial. The Court of Appeals affirmed his convictions because it was unpersuaded that the failure to correct Yancy’s false testimony made a difference in the jury’s estimation of his credibility. People v Smith, unpublished opinion per curiam of the Court of Appeals, issued October 29, 2013 (Docket No. 304935), p 5. The defendant then sought this Court’s review, and we granted leave to appeal.[5]
II. LEGAL BACKGROUND
A due process violation presents a constitutional question that this Court reviews de novo. People v Wilder, 485 Mich 35, 40; 780 NW2d 265 (2010). It is inconsistent with due process when the prosecution allows false testimony from a state’s witness to stand uncorrected. Napue, 360 US at 269; see also People v Wiese, 425 Mich 448, 453-454; 389 NW2d 866 (1986); Giglio v United States, 405 US 150, 153; 92 S Ct 763; 31 L Ed 2d 104 (1972). It is well established that “a State may not knowingly use false evidence, including *476 false testimony, to obtain a tainted conviction...." Napue, 360 US at 269. Indeed, the prosecution has an affirmative duty to correct false testimony, and this duty specifically applies when the testimony concerns remuneration for a witness’s cooperation. See Giglio, 405 US at 154-155; Wiese, 425 Mich at 455-456. The responsibility “does not cease to apply merely because the false testimony goes only to the credibility of the witness.” Napue, 360 US at 269. Nor is the blameworthiness of the prosecutor relevant. Smith v Phillips, 455 US 209, 220 n 10; 102 S Ct 940; 71 L Ed 2d 78 (1982). Rather, while “not every contradiction is material” and the prosecutor need not correct every instance of mistaken or inaccurate testimony, United States v Martin, 59 F3d 767, 770 (CA 8, 1995), it is the effect of a prosecutor’s failure to correct false testimony that “is the crucial inquiry for due process purposes,” Smith, 455 US at 220 n 10. A prosecutor’s capitalizing on the false testimony, however, is of particular concern because it “reinforce [s] the deception of the use of false testimony and thereby contribute [s] to the deprivation of due process.” DeMarco v United States, 928 F2d 1074, 1077 (CA 11, 1991); see Jenkins v Artuz, 294 F3d 284, 294-295 (CA 2, 2002) (stating that the prosecutor’s promotion of the false testimony at summation “plainly sharpened the prejudice,” “ ‘ha[d] rio place in the administration of justice [,] and should neither be permitted nor rewarded’ ”) (citations and quotation marks omitted); Mills v Scully, 826 F2d 1192, 1195 (CA 2, 1987) (“[Tjhere may be a deprivation of due process if the prosecutor reinforces the deception by capitalizing on it in closing argument. . . .”). Anew trial is required if the uncorrected false testimony “could... in any reasonable likelihood have affected the judgment of the jury.” Napue, 360 US at 271-272; see also Giglio, *477 405 US at 154. Furthermore, as one federal circuit court of appeals has stated:
Regardless of the lack of intent to lie on the part of the witness, Giglio and Napue require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. This is not to say that the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness’s responses on cross-examination. However, when it should be obvious to the Government that the witness’ answer, although made in good faith, is untrue, the Government’s obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury. [United States v Harris, 498 F2d 1164, 1169 (CA 3, 1974).][6]
*478 III. APPLICATION
A. FAILURE TO CORRECT TESTIMONY
As the Court of Appeals correctly observed, Yancy’s trial testimony undoubtedly left the impression that he received no payment of any kind for his participation in this case, either for his testimony or for his prior cooperation that was the necessary condition to his testimony. The overall impression conveyed was false. Whether Yancy understood why or for what he had been compensated, the prosecutor knew that Agent Harris had given uncontroverted pretrial testimony that Yancy was compensated for information central to the formal prosecution of the defendant.
Instead of rectifying this false impression regarding Yancy’s involvement, the prosecutor capitalized on and exploited it. Though well aware of Harris’s testimony and the fact of Yancy’s compensation, the prosecutor never took any steps to correct or explain Yancy’s testimony. Rather, the prosecutor carefully limited her questioning of Yancy to the fact that he had been paid for cooperating with law enforcement, while never seeking to clarify that Yancy had been compensated for his cooperation in the investigation of the defendant. To the contrary, the prosecutor further distanced Yancy from the latter by emphasizing that any payment for his cooperation came from a “federal agency” and, impliedly, had nothing to do with the pending charges against the defendant. The prosecutor’s follow-up questions built on this obfuscation; after leaving Yan-cy’s testimony regarding his cooperation with law enforcement ambiguous and untethered to the defendant’s case, the prosecutor pivoted directly to the more *479 limited claim that Yancy specifically had not been paid to testify at trial. And when Yancy specifically denied during cross-examination that he had been compensated in connection with the investigation of the defendant, the prosecutor again did nothing to correct it.[7] *480 She instead used Yancy’s general claims of noncompen-sation to her advantage in closing, urging the jury to credit his story because “[h]e told you he did not get consideration on this case for testifying, that he got consideration on other cases that the task force was involved with.” (Emphasis added.)
Capitalizing on Yancy’s testimony that he had no paid involvement in the defendant’s case is inconsistent with a prosecutor’s duty to correct false testimony.[8] Indeed, the prosecutor sought to transform *481 testimony that might have been merely confusing on its own into an outright falsity. Irrespective of the veracity of Yancy’s claim that he had not been paid to *482 “testify,” the prosecutor should not have capitalized on Yancy’s testimony after Yancy had confusingly denied being paid for cooperating in “this case.”[9] Napue, 360 US at 269. The prosecutor’s repeated emphasis on Yancy’s lack of compensation for “testifying” and her comments at closing argument enhanced the misleading impression that Yancy was a totally independent witness. Her actions served to underscore the jury’s false impression that because Yancy had not been paid to “testify,” he had no questionable incentive for his participation in this case.[10] Simply put, the prosecutor sought to benefit from the problematic testimony and use it to her advantage. This prosecutorial conduct does not comport with due process.[11] See DeMarco, 928 F2d at 1077; Jenkins, 294 F3d at 294-295.
*483 B. ERROR AFFECTING THE JUDGMENT OF THE JURY
Whatever Yancy may have believed about the truth of his testimony, we conclude both that it conveyed a serious misimpression about the nature of his involvement in the case and that the prosecutor’s exploitation of that testimony violated the defendant’s right to due process. For this reason, we disagree with the Court of Appeals that this violation does not warrant relief. Rather, in light of the effect that Yancy’s uncorrected testimony had on his credibility and the role that credibility played in securing the defendant’s convictions, we conclude that there is a “reasonable likelihood” that the false impression resulting from the prosecutor’s exploitation of the testimony affected the judgment of the jury. Napue, 360 US at 271. Accordingly, the defendant is entitled to a new trial.
As noted, there was no physical evidence tying the defendant to the crime. No murder weapon was ever recovered, the defendant’s fingerprints were not found at the scene, and no other physical evidence confirmed that he had ever been at Pass’s house. The defendant was convicted solely on the testimony of Lard and Yancy, two witnesses with significant credibility issues. As the jury was made aware, Lard was testifying pursuant to a favorable plea agreement for his role in the crime,[12] and *484 his testimony at trial proved inconsistent not only with Yancy’s version of events, but with his own pretrial account.[13]
Yancy’s account of the crime was also riddled with inconsistencies[14] and did not otherwise cast him in a particularly favorable light. First, while Yancy admitted at trial that he and the victim “had a kind of personal bond,” he also admitted that he did not call an ambulance or the police while the victim was “gurgling off his blood” on the floor after being shot, instead leaving the house with the defendant and Lard to go share some of the victim’s cocaine. Yancy acknowledged that he then promptly disappeared from town for approximately a year. Furthermore, Yancy admitted, and Lard confirmed, that Yancy and the defendant had “a little beef going on” at the time of the murder, arising from a violent dispute over money a few weeks earlier.
*485 There was, therefore, a basis for skepticism about both Lard and Yancy. What is most significant for our assessment, however, is that, as far as the jury knew, Yancy was uniquely credible in one respect: he was the sole lay witness who did not directly benefit from his participation in the case. Unlike Lard, he was not facing charges in connection with Pass’s murder, and according to his testimony, he had not been compensated for testifying and had no paid connection with the defendant’s case. Of course, Yancy did receive at least one known direct benefit for his participation in the case— financial compensation. But the prosecutor exploited the false impression to the contrary, urging the jury to believe Yancy—and convict the defendant—because of it. Given that the prosecution’s case hinged entirely on the jury’s credibility assessment of Lard and Yancy, this emphasis on the one (albeit false) indication of the difference in trustworthiness between them is unsurprising. For the same reason, however, we cannot overlook its prejudicial effect. See Wiese, 425 Mich at 456 (concluding, in a case that “depended almost entirely on [the falsely testifying witness’s] testimony,” that the use of the false testimony and the defendant’s resulting inability to properly question the witness’s credibility “reasonably could have affected the judgment of the jury”).
In concluding that this prejudice was too insignificant to warrant relief, the Court of Appeals stressed that the impression that he had not been compensated could not have “bolstered” the “fairly dreadful state of Yancy’s credibility. .. .” Smith, unpub op at 5. We agree that Yancy lacked credibility in a number of respects unrelated to his role as a paid informant. But we disagree with the Court of Appeals that the impossibility of raising Yancy’s credibility from an already “dreadful state” is an appropriate way to frame the critical issue. *486 Instead, the question is what effect would likely have resulted if the jury had understood that Yancy was compensated for his information against the defendant. In our view, this unique additional impeachment evidence was not cumulative or immaterial. See Napue, 360 US at 270 (“[W]e do not believe that the fact that the jury was apprised of other grounds for believing that the witness . .. may have had an interest in testifying against [the defendant] turned what was otherwise a tainted trial into a fair one.”); Reynoso v Giurbino, 462 F3d 1099, 1117 (CA 9, 2006) (“Unlike the other evidence used to impeach the eyewitnesses ... such as inconsistent statements and general attacks on their credibility, evidence of their financial motives would have established a real incentive to lie, explaining why their testimony may have been fabricated.”). Rather, there is good reason to believe that if the jury had been made aware that Yancy was compensated for his cooperation, the prosecution would have had a more difficult task persuading the jury that he should be believed.
Put simply, the “dreadful state” ofYancy’s credibility would have been even more dreadful had the jury learned that he was paid for his information against the defendant. And contrary to the Court of Appeals’ suggestion, the prejudice from the prosecutor’s exploitation of Yancy’s potentially misleading testimony cannot be discounted simply because the jury had other reasons to disbelieve Yancy. Indeed, this case demonstrates the opposite to be true. Presented with a witness who was revealed to be a regular drug user, to have been in a dispute with the defendant about money, to have taken the victim’s drugs, to have left the victim “gurgling off his blood” on the floor, and to have then left town for a year, the jury was more likely to have viewed the false inference that Yancy was not compensated at all for his *487 involvement as the most significant basis for crediting his testimony against the defendant.[15]
Due process required that the jury be accurately apprised of the incentives underlying the testimony of this critical witness, and plainly that the prosecution not exploit any confusion relating to this critical topic. See United States v Cervantes-Pacheco, 826 F2d 310, 315 (CA 5, 1987) (“As in the case of the witness who has been promised a reduced sentence, it is up to the jury to evaluate the credibility of the compensated witness.”) (emphasis added). Given the centrality of Yancy’s credibility to the prosecution’s case and the dearth of other evidence supporting the defendant’s convictions, we hold that there was a reasonable likelihood that the prosecutor’s exploitation of Yancy’s misleading testimony affected the judgment of the jury.
IV. CONCLUSION
For the foregoing reasons, we conclude that the defendant is entitled to a new trial. Accordingly, we reverse the judgment of the Court of Appeals in part, *488 vacate the defendant’s convictions, and remand this case for proceedings consistent with this opinion.
Young, C.J., and Markman and Viviano, JJ., and BERNSTEIN, J. (except for footnote 5), concurred with McCormack, J.

 More than three years before the trial in this case, around October 2008, the Federal Bureau of Investigation paid Yancy $4,000 for information he provided to a joint local and federal task force relating to the task force’s investigation of the “Pierson Hood gang” and its wide-ranging criminal activity in the Flint area, including facts relevant to the murder at issue in this case. Accordingly, this Genesee County prosecution was the result of the work of that task force, including Yanc/s compensated cooperation with it.

 The assistant prosecutor who appeared at this pretrial hearing was also the trial prosecutor.

 Harris’s full explanation was as follows:
I did determine the amount on Mark Yancy was $4,000. The request was originally requested or submitted in October of2008. I could not recall or could not find the date it was actually paid. The reason for [Yancy’s] payment was for information against Pierson Hood members and their involvement, also for the Larry Pass homicide which was against Mr. Lard and Mr. Smith.
Harris made no further statements about the purposes of Yancy’s compensation, nor did he describe how the payment was apportioned respective to information about Pierson Hood or the Pass homicide. We therefore disagree with the dissent’s characterization of Harris’s testimony as stating that the payment was “due in significant part for [Yancy’s] cooperation relating to [Pierson Hood].” Post at 498 n 6 (emphasis added).

 The full exchange was as follows:
*473 [Prosecutor]: Now, you’ve been paid by a federal agency for cooperation. Is that correct?
[Yancy]: Yes.
[Prosecutor]: And the money that you were paid was not related to testifying in this case, was it?
[Defense Counsel]: Objection. Leading.
[Yancy]: No.
The Court: Okay. You can rephrase the question.
[Prosecutor]: I’ll rephrase.
[[Image here]]
Were you paid for your testimony in this case?
[Yancy]: No.

 We granted to leave to appeal, limited to two issues: “(1) whether the defendant was deprived of his constitutional right to a speedy trial; and (2) whether the defendant was deprived of his due process right to a fair trial through the presentation of perjured testimony.” People v Smith, 496 Mich 865 (2014).
While we agree that the delay in this case was extraordinary, we are not persuaded that the defendant has shown sufficient prejudice to merit dismissal for a violation of his right to a speedy trial. See Barker v Wingo, 407 US 514, 530, 532; 92 S Ct 2182; 33 L Ed 2d 101 (1972). We therefore affirm on that issue for the reasons stated in the Court of Appeals’ opinion.

 See also Jenkins, 294 F3d at 296 (“[W]hile [the prosecutor’s] questions elicited technically correct answers, . .. they left the jury with the mistaken impression that no plea agreement existed. We can think of no credible explanation for [the prosecutor’s] conduct other than an attempt to reinforce [the witness’s] false testimony.”); United States v Barham, 595 F2d 231, 241 (CA 5, 1979) (asserting the prosecution’s duty to correct testimony that “if not outright lies, certainly conveyed the false impression that none of [the] witnesses had received any promises of leniency or other considerations”).
In Harris, a government witness falsely testified during cross-examination that in exchange for her testimony against the defendants, the prosecution had made no promises to help her achieve a reduced sentence on pending state charges against her. Harris, 498 F2d at 1166-1167. The prosecutor brought the witness’s false testimony to the attention of the court and defense counsel a day after the testimony was given but still during the government’s case-in-chief and offered to stipulate it. Id. at 1167. Unlike the prosecutor in this case, the Harris prosecutor did not seek to capitalize on the false testimony, but rather offered to correct it. Id. Indeed, it was the defendant’s affirmative failure to take advantage of that offer and use other means to reveal the untruth that was fatal to the ability to complain about it on appeal. Id. at 1170. The dissent overlooks this important difference, and conflates the distinct prosecutorial duties to disclose exculpatory information, see Brady v Maryland, 373 US 83, *478 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), and to refrain from using false or misleading testimony to obtain a conviction, see Napue, 360 US at 269. See note 8 of this opinion.

 The obligation to avoid presenting false or misleading testimony of its own witness begins and ends with the prosecution and is prudent in the unique Napue context because Napue requires the prosecution’s knowledge of the false or misleading testimony of its own witnesses. Napue, 360 US at 269. While we do not disagree that a defendant can waive a claim of error under Napue, we do not share the dissent’s view that there was waiver in this case. First, we disagree with the dissent that the record reveals any strategy by defense counsel to keep the impeaching information from the jury. Given that we see no strategy here, the dissent’s reference to cases finding waiver when counsel strategically elected not to address a government witness’s false testimony is beside the point. We note, however, that we do not read all the cases the dissent cites in support of this general proposition as relevant. Two did not involve false testimony about a witness’s cooperation agreement, see Beltran v Cockrell, 294 F3d 730, 735 (CA 5, 2002) (observing that the defendant prevented the prosecution from clarifying the allegedly false testimony that the defendant was the only person identified as the assailant); United States v Decker, 543 F2d 1102, 1105 (CA 5, 1976) (noting that any error from the witness’s false statements about his attorney’s presence at his cooperation meeting were harmless), and in another, the court held that it was not clear that there was any cooperation agreement with the witness at all, see United States v Meinster, 619 F2d 1041, 1045 (CA 4, 1980) (“Nothing was promised in exchange for [the witness’s] testimony in this case.”). Importantly, however, when a prosecutor has capitalized on the false or misleading evidence, the waiver rule is more nuanced. See Jenkins, 294 F3d at 296 (concluding that there was no waiver because “the prosecutor’s actions cannot be overlooked on the ground that [defense] counsel did not continue to seek to gain an admission from [the witness] as to the plea agreement”); Barham, 595 F2d at 243 n 17 (concluding that there was no waiver because the prosecutor’s “misleading questions .. . reinforced the deception”); United States v Sanfilippo, 564 F2d 176, 178-179 (CA 5, 1977) (concluding that there was no waiver when the prosecutor failed to correct and subsequently capitalized on the false testimony); De-Marco, 928 F2d at 1077 (concluding that there was no waiver when the prosecution’s capitalizing on the testimony “contributed to the deprivation of due process”). Therefore, even if, as the dissent argues, counsel *480 had a conscious strategy to keep the true nature of Yancy’s compensation from the jury, it is far from clear whether that would have led to a waiver in this case, given that the prosecutor capitalized on the misleading evidence in her summation to the jury. In any event, what precise role counsel’s effectiveness might play in determining the reviewability of a Napue complaint on appeal is not one we need reach today, since the prosecution has never argued in the course of this appeal that the defendant waived this Napue objection. See People v McGraw, 484 Mich 120, 131 n 36; 771 NW2d 655 (2009).

 The dissent insists that the prosecution’s duty to correct false testimony under Napue, 360 US at 269, must be coupled with the separate, though often overlapping, duty to disclose exculpatory information under Brady, 373 US at 87. The dissent consequently asserts that “[i]t is the secreting of evidence that is offensive to due process.” Post at 499. We agree that the secreting of evidence violates due process, but so too does a prosecutor’s exploitation of false testimony by a state witness to gain a conviction, whether done together with a failure to disclose or not. In many cases, dereliction of both duties happens in tandem when a witness falsely testifies about an undisclosed cooperation agreement. But they need not happen together, and when they do not, the prosecution’s Napue duty is not mitigated because it complied with its Brady duty. See Jenkins, 294 F3d at 296; Sanfilippo, 564 F2d at 178-179; DeMarco, 928 F2d at 1076-1077; Belmontes v Brown, 414 F3d 1094, 1115 (CA 9, 2005) (“Whether defense counsel is aware of the falsity of the statement is beside the point.... The prosecutor’s duty to correct false testimony arises, not simply out of a duty of fairness to the defendant, but out of the free standing constitutional duty of the State and its representatives to protect the system against false testimony.”), rev’d on other grounds sub nom Ayers v Belmontes, 549 US 7; 127 S Ct 469; 166 L Ed 2d 334 (2006) (citations and quotation marks omitted). The dissent’s argument to the contrary is not supported by the authority *481 it cites. Routly v Singletary, 33 F3d 1279 (CA 11, 1994), for example, does not address the idea that all Napue violations must accompany Brady violations. Rather, Routly involved unsuccessful and overlapping Brady and Napue claims, but each was denied because the prosecution had complied with each duty. Id. at 1284-1287.
Furthermore, the post-Sanfllippo cases in the United States Court of Appeals for the Fifth Circuit that the dissent cites certainly did not distinguish Sanfllippo’s relevance in cases in which, as here, the prosecutor capitalized on a freestanding Napue error. Compare Sanfilippo, 564 F2d at 178-179 (concluding that there was no waiver when the prosecutor failed to correct and subsequently capitalized on the false testimony), with Beltran, 294 F3d at 736-737 (concluding that Sanfll-ippo was inapposite because the prosecution had not “used the false testimony consciously allowed by the defense as part of a legal strategy’), and United States v Antone, 603 F2d 566, 570-571 (CA 5, 1979) (concluding that Sanfllippo was inapposite because it involved false testimony of “far more serious impact,” i.e., relating to the conditions of the witness’s plea deal for his testimony, while Antone simply involved an arrangement to have legal counsel appointed for the witness). And indeed, at least one post-Sanfllippo case from the Fifth Circuit has affirmed Sanfllippo’s rule that a prosecutor’s capitalizing on false testimony might result in a due process deprivation even when the defense can be charged with knowledge of the evidence. See Barham, 595 F2d at 243 (stating that the prosecutor’s “misleading questions .. . reinforced the deception” and “undermine [d] the Government’s argument that defense counsel waived the false evidence issue” by virtue of his knowledge of the falsity).
There is no question that the prosecution complied with its Brady obligation regarding Yancy’s compensation for his cooperation. Yet when Yancy’s trial testimony did not reflect the true nature of his agreement, instead of clarifying, the prosecutor exploited the testimony to her advantage. This due process error stands apart from a failure to disclose. See Jenkins, 294 F3d at 296 (stating that “the prosecutor’s actions cannot be overlooked” on the ground that defense counsel knew about and “did not continue to seek to gain an admission from [the witness] as to [his] plea agreement”); Napue, 360 US at 269 (stating that the duty to correct false evidence arises “when it appears”). The dissent’s understanding that any Napue violation is only meaningful when coupled with a Brady violation simply misunderstands the separate duties.

 Indeed, it would be a much closer question if the prosecutor had not sought to create a false impression at closing argument. But the question of whether, in isolation, Yancy’s uncorrected or unclarified cross-examination testimony would justify reversal is not before us in this case, and we decline to address it as though it had been presented in that fashion.

 We note that the prosecutor’s duty to correct false or misleading testimony particularly arises in those instances in which law enforcement has directly participated in the subject matter of the testimony. Such participation would typically arise for purposes of this duty in the context of plea negotiations or other agreements for cooperation and testimony involving the prosecutor’s office and others. Such participation may also arise when, as here, the prosecutor has direct knowledge of an agreement for cooperation between law enforcement and other persons concerning the particular case at hand.

 We disagree with the dissent that we “now holdO prosecutors to the unacceptably high and extraordinarily ambiguous standard of having to correct every instance of mistaken, inaccurate, or incomplete testimony or risk the possibility that every possible or perceived contradiction will be rendered material.” Post at 495. We respectfully submit that the dissent has mischaracterized and broadened the proper understanding of our opinion. As we emphasize above, a prosecutor need not correct every instance of mistaken or inaccurate testimony, Martin, 59 F3d at 770, nor must he or she “play the role of defense counsel, and ferret out ambiguities in [the] witness’s responses on cross-examination,” Harris, *483 498 F2d at 1169. Indeed, it is on the basis of the prosecutor’s exploitative tactics in this case that we conclude that she had and then breached her duty to correct the false impression she created. Accordingly, to be absolutely clear, we do not hold today that the prosecutor has a limitless obligation to correct every instance of false or misleading testimony, regardless of its subject matter.

 Lard agreed to testify after spending approximately two years in jail awaiting trial for his part in Pass’s murder. Lard was charged with felony murder, armed robbery, and other gun-related offenses, and as he acknowledged during his testimony, he was facing a mandatory life sentence on those charges. See MCL 750.316(1) (mandatory life impris *484 onment without parole for first-degree murder). Pursuant to his plea agreement, these charges were dismissed, and Lard pleaded guilty to reduced charges of manslaughter, MCL 750.321, and unarmed robbery, MCL 750.530(1), each of which carried the possibility of probation.

 For example, Lard claimed in a pretrial statement to police that the defendant took a gun from Pass, but testified at trial that he did not see the defendant with a gun at any time. Lard also initially denied being at Pass’s house on the night of the shooting. Moreover, Lard insisted that Yancy was a liar; Yancy testified that Lard had pulled a gun out of his sweatshirt, but Lard denied ever possessing one.

 Yancy initially told police officers that the defendant was the only one with a visible weapon. He then contradicted that statement both at the preliminary examination, when he testified that he never saw the defendant with a gun, and at trial, when he testified that it was Lard whom he saw with a gun. Yancy also testified at the preliminary examination that he had not consumed any drugs at Pass’s house before the shooting, though he admitted at trial that he had. Similarly, he admitted at trial using some of Pass’s drugs with the defendant and Lard after the shooting, though he had claimed at the preliminary examination that they never “gave” him any of those drugs (explaining at trial that he considered “giving” drugs to be different from “sharing” them).

 The dissent argues that the defendant has forfeited his claim of error because he failed to object at trial and concludes therefore that the defendant’s claim must be reviewed under the plain-error standard rather than Napue’s standard for reversal. While we are not convinced that plain-error analysis applies to Napue errors, we disagree with the dissent’s conclusion that the defendant’s claim does not meet that standard. As outlined above, (1) an error clearly occurred in this case, (2) that error was “clear and obvious” insofar as the jury was left with a false impression of Yancy’s involvement, and (3) the error clearly affected substantial rights insofar as we find that it had a “reasonable probability” of affecting the jury’s verdict. Furthermore, an error like this, in which the prosecutor deliberately exploited misleading evidence before the jury, clearly affects "the fairness, integrity or public reputation of judicial proceedings.” People v Cannes, 460 Mich 750, 763; 597 NW2d 130 (1999), quoting United States v Olano, 507 US 725, 736; 113 S Ct 1770; 123 L Ed 2d 508 (1993) (quotation marks omitted).