*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

STEPHAN JAY-MIKEL BRYSON,

Defendant-Appellant.

UNPUBLISHED
November 17, 2025
10:14 AM

No. 358946
Oscoda Circuit Court
LC No. 19-001641-FH

Before: GADOLA, C.J., and BOONSTRA and SWARTZLE, JJ.

PER CURIAM.

Defendant, Stephan Jay-Mikel Bryson, appeals by right his convictions for first-degree home invasion, MCL 750.110a(2)(a), three counts of larceny of a firearm, MCL 750.357b, and possession of a firearm in the commission of a felony (felony-firearm), MCL 750.227b(1). Defendant was sentenced to serve 106 months (8 years and 10 months) to 30 years' imprisonment for home invasion, 5 to 7 years and 6 months' imprisonment for each count of larceny of a firearm, and 2 to 3 years' imprisonment for felony-firearm. Defendant filed a motion to remand with his brief on appeal. This Court granted the motion and remanded for the trial court to conduct an evidentiary hearing on two issues: (1) whether defendant's right to due process was violated by the prosecution's presentation of, and failure to correct, false testimony, and (2) whether defendant's right to due process was violated under *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 215 (1963), when the prosecution failed to disclose the full terms of an accomplice witness's agreement for testimony, and by the prosecution's failure to disclose impeachment evidence of a criminal conviction. *People v Bryson*, unpublished order of the Court of Appeals, entered March 10, 2023 (Docket No. 358946). After this Court granted the motion to remand, defendant filed a motion for a new trial in the trial court based on the same two issues. The trial court held an evidentiary hearing and ultimately denied defendant's motion for a new trial. Defendant now appeals.

## I. FACTS AND PROCEDURAL HISTORY

On August 19, 2016, police were called to 430 Popps Road in Mio in response to a break-in. The house was unoccupied at the time because the owner, Robert Boerner, was incarcerated.

Robert's brother, Michael, was present when the police arrived. Michael noticed the bedroom window had been pried open. Deputy Dustin Johnson of the Oscoda County Sheriff's Office said the house "looked like it had been gone through. Several of the drawers and stuff had been opened and ransacked." Deputy Johnson attempted to obtain latent fingerprints from the window, but he was not able to locate any prints. He took photos of some shoe impressions he found. Three handguns, including Robert Boerner's service weapon from when he was a sheriff's deputy, were stolen from the home.

The police had no leads and the case went unsolved for two years. On October 3, 2018, Kaitlyn Wilson was interviewed by police in connection with a complaint of domestic violence. During this interview, Kaitlyn confessed that she was involved in the break-in at the Boerner residence two years prior. At that time, she did not implicate defendant, her boyfriend and the father of her child. Kaitlyn implicated only herself and her father (defendant's stepfather), Leonard Wilson. But when Kaitlyn was arrested for the break-in in 2019, she disclosed that she and defendant broke into the house while her father acted as a lookout. Defendant was charged with first-degree home invasion, three counts of larceny of a firearm, felony-firearm, and misdemeanor malicious destruction of a building. Leonard was charged with aiding and abetting first-degree home invasion, aiding and abetting misdemeanor malicious destruction of a building, and aiding and abetting larceny of a firearm. Kaitlyn was also charged in connection with the home invasion, but her specific charges are not found in the record.

At defendant's trial, Kaitlyn and Leonard testified for the prosecution. Leonard testified that he stood in the street and acted as a lookout while defendant and Kaitlyn broke into the house through a window. Leonard stated that when he was standing in the street, he initially did not see defendant, but then "[defendant] appeared in the window to assist [Kaitlyn] in the window." Upon further questioning by the trial court, Leonard clarified that when he saw defendant helping Kaitlyn through the window, defendant was already inside the home. When defendant and Kaitlyn came out of the house, they were carrying a duffle bag full of items. Defendant, Kaitlyn, and Leonard went to Leonard's house and opened the duffle bag. Leonard testified there were three guns in the bag: a 9mm, a 38, and a 357 police-issued handgun. There were also coins, a stack of $2 bills, and various other items.

Leonard testified that he was initially charged in connection with the break-in and "did time in jail." After establishing Leonard was involved in the break-in, the prosecutor and Leonard had the following exchange on direct examination:

*Q*. And let's clarify for the jurors, you were charged with that crime; correct?

*A*. Yes, I was charged with that crime and did time in jail. So.

*Q*. Okay. But you have not—and in regards to you testifying today, there was a plea agreement that you would plead to a misdemeanor and testify today truthfully; is that correct?

*A*. That's correct.

On cross-examination, Leonard testified:

*Q*. And you testified earlier that you—that there was an agreement for you to testify; is that correct?

*A*. Yes, there was an agreement.

*Q*. Where [sic] you charged with felonies in this instance?

*A*. Most definitely, and I sat for six months.

*Q*. But you did in fact plead to a misdemeanor; correct?

*A*. Yes. I took the same plea that other people were offered.

Kaitlyn testified that she, her father Leonard, and defendant planned to break into the Boerner home to find pictures; they broke in through a window and stole three guns as well as other items. The prosecutor introduced a photograph of defendant holding one of the stolen guns, and Kaitlyn stated defendant sent her the photo on Snapchat. Kaitlyn also admitted that her story changed. At first, Kaitlyn claimed it was just her and her father who participated in the home invasion. Because she was dating defendant at the time, and they had a child together, she did not want anything to happen to him. Kaitlyn testified, "…if I were to go away, the deal was, he would take care of the kids." Kaitlyn confirmed she was arrested pursuant to a felony warrant for the home invasion in 2019. The prosecutor inquired into Kaitlyn's agreement to testify against defendant:

*Q*. … And in regards to that, your attorney and myself, the prosecutor's office, came up with a plea deal for you to testify truthfully; is that correct?

*A*. Yes.

*Q*. And in return for that testimony that your criminal charges would be dismissed; is that correct?

*A*. Yes.

At the close of proofs, the trial court instructed the jury as follows:

Leonard Wilson and Kaitlyn Wilson says [sic] that they took part in the crime that the Defendant is charged with committing. Leonard Wilson has already been convicted of charges arising out of the commission of that crime. Leonard Wilson has been promised to receive—and has received a plea offer to a reduced charge for the crime that the Defendant is charged with committing. Based upon any information derived directly or indirectly from the witness's truthful testimony.

Kaitlyn Wilson has been promised and received a dismissal of charges for the crime that the Defendant is charged with committing. Again, based upon any information derived directly or indirectly from that witness's truthful testimony.

\*\*\*

> You have heard testimony that witness[es], Leonard Wilson and Kaitlyn Wilson, made agreements with the prosecutor about charges against him or her in exchange for his or her testimony in this trial.
>
> You also heard testimony that Leonard Wilson served a six-month jail sentence per that agreement.
>
> You are to consider this evidence only as it relates to Leonard Wilson and Kaitlyn Wilson's credibility and as it may tend to show his or her bias or self-interest.

Defendant was found guilty on all counts except for malicious destruction of a building.

Defendant appealed his convictions. Appellate counsel was appointed and initial investigation into the case revealed that, while Leonard Wilson was charged with aiding and abetting first-degree home invasion, larceny of a firearm, and malicious destruction of property, no guilty plea was ever entered. Rather, all of the charges were dismissed pursuant to a *nolle prosequi* motion by the prosecutor, for the reason dismissal was "in the interest of justice." Appellate counsel also discovered that Leonard Wilson had a March 12, 2020 misdemeanor conviction for false pretenses in violation of MCL 750.218(3)(a), and he was sentenced to serve 180 days in jail. Defendant moved for a new trial and evidentiary hearing based on this newly discovered evidence. As indicated above, this Court remanded for the trial court to hold an evidentiary hearing on defendant's claims.

The evidentiary hearing was held on November 3, 2023. The Oscoda County Prosecutor, Kristi McGregor, was the prosecutor at defendant's trial. Thus, the Crawford County Prosecutor was appointed as a special prosecutor to participate in the evidentiary hearing. Defendant's trial counsel, Scott Windsor, testified for the defense. Windsor testified that the prosecution provided Leonard's "Agreement to Testify" as part of discovery in the case, which stated, in full: "I, Leonard Phil Wilson, pursuant to the plea agreement in the 23rd Circuit Court Case No. 19-001642-FH hereby agrees to testify truthfully as needed in any hearing, trial or discovery issue in the following case: People of the State of Michigan v Stephan Jay-Mikel Bryson; Circuit Court Case No. 19-001641-FH at any point in time while this case is pending." Windsor did not remember if he knew the details of Leonard's plea agreement at the time of trial. Windsor assumed, based on Leonard's testimony, that he was actually convicted of a misdemeanor and spent time in jail. Windsor was never informed that Leonard's charges were actually dismissed entirely. Windsor was also never informed of Leonard's conviction for a crime of dishonesty.

Kristi McGregor testified for the prosecution. McGregor stated that the plea offer to Leonard was to plead guilty to a misdemeanor in exchange for the dismissal of the felony charged and any habitual offender enhancement. This was never made part of a written agreement, but was only a conversation between the prosecutor, Leonard, and Leonard's attorney. McGregor wanted Leonard to testify in defendant's case first, before allowing him to plead guilty. That way, she would be sure that Leonard testified truthfully and would not have to file a motion to set aside the plea if he did not testify truthfully. Defendant's case kept getting adjourned due to the Covid-19 pandemic, so McGregor requested adjournments in Leonard's case as well. Once the trial court

stated there would be no more adjournments allowed in Leonard's case, McGregor dismissed the charges without prejudice, with the intent that she would re-file misdemeanor charges after Leonard testified at defendant's trial. McGregor always handled cooperating witness testimony this way. But McGregor admitted that she failed to recharge Leonard, and did not realize it until she read defendant's motion for a new trial. It was revealed that Leonard Wilson died in June 2022.

McGregor testified that she was aware of Leonard's license forgery case in Oscoda County because she filed the charge on February 21, 2020, and dismissed it for lack of evidence in April 2020. McGregor stated the dismissal was not in exchange for testimony in defendant's case. Leonard allegedly forged the title to a truck in Oscoda County and then sold that truck to someone in neighboring Ogemaw County using the forged title. Thus, he was charged with license forgery in Oscoda County and uttering and publishing in Ogemaw County. Despite the factual overlap between the cases, McGregor claimed she was unaware of the uttering and publishing case, and she was unaware Leonard pleaded guilty and was convicted of misdemeanor false pretenses in that case until she read defendant's motion for a new trial.

The trial court found that Leonard's testimony as to his plea agreement was not substantially false. Even if false, according to the trial court, there was not a reasonable likelihood that the testimony affected the judgment of the jury because Leonard's status as an accomplice witness already impeached his credibility. Therefore, the trial court found that defendant's right to due process was not violated. Further, the trial court found the prosecutor disclosed Leonard's agreement to testify to defense counsel before trial, thus there was no *Brady* violation with respect to the plea agreement. The trial court found the prosecutor did fail to disclose Leonard's conviction for a crime of dishonesty. However, the trial court found the result of the proceeding would not have been different had the crime of dishonesty been disclosed. Therefore, the trial court denied the motion for a new trial.

## II. FAILURE TO CORRECT TESTIMONY

Defendant argues the trial court erred in denying the motion for a new trial based on its conclusion that Leonard's testimony was not substantially false. We agree.

## A. STANDARD OF REVIEW

This Court reviews a trial court's decision on a motion for a new trial for an abuse of discretion. *People v Rogers*, 335 Mich App 172, 191; 966 NW2d 181 (2020). "A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable outcomes." *Id*. The factual findings underlying the trial court's decision are reviewed for clear error. *Id*. "A finding is clearly erroneous when this Court is left with the definite and firm conviction that the trial court erred." *Id*. An alleged due process violation is a constitutional question that this Court reviews de novo. *People v Smith*, 498 Mich 466, 475; 870 NW2d 299 (2015).

-5-

## B. ANALYSIS

"It is inconsistent with due process when the prosecution allows false testimony from a state's witness to stand uncorrected." *Id*., citing *Napue v Illinois*, 360 US 246, 271-272; 79 S Ct 1173; 3 L Ed 2d 1217 (1959). "[A] conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment[,]" and "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009) (quotation marks and citations omitted). A prosecutor has an affirmative duty to correct false testimony, "and this duty specifically applies when the testimony concerns remuneration for a witness's cooperation." *Smith*, 498 Mich at 476. This duty arises when a witness gives false testimony as well as when a witness gives substantially misleading testimony. *Id*. at 477. While a prosecutor "need not correct every instance of mistaken or inaccurate testimony, it is the effect of a prosecutor's failure to correct false testimony that is the crucial inquiry for due process purposes[.]" *Id*. at 476 (quotation marks and citations omitted). "The defendant has the burden of demonstrating that a witness's testimony was, in fact, false." *People v Thurmond*, 348 Mich App 715, 736; 20 NW3d 311 (2023).

In deciding whether there is a reasonable likelihood that the false evidence could have affected the outcome of trial, this Court must inquire whether the error was harmless. *People v Anderson*, 446 Mich 392, 404; 521 NW2d 538 (1994), citing *Chapman v California*, 386 US 18, 24; 87 S Ct 824; 17 L Ed 2d 705 (1967). It is the prosecution that has the burden of proving harmless error beyond a reasonable doubt by showing that there is no reasonable probability that the false evidence might have contributed to the conviction. *Id*. at 405-406.

In *Napue*, the U.S. Supreme Court reversed the defendant's conviction based on uncorrected, false testimony introduced at trial. *Napue*, 360 US at 267-272. A witness for the prosecution denied that he had been promised a reduced sentence in return for his testimony. *Id*. at 270-271. That testimony was false because the prosecutor had promised to recommend a reduced sentence for the witness if the witness testified against defendant. *Id*. at 267. The Supreme Court held that the principle that a state may not knowingly use false testimony to obtain a conviction applies when the false testimony implicates the credibility of the witness. *Id*. at 269. The Supreme Court stated, "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." *Id*. at 269-270.

Here, it is clear that Leonard's testimony was false. Leonard testified that he pleaded guilty to a misdemeanor and implied that he had already served a six-month jail sentence as a result of that conviction. This was false because Leonard had not pleaded guilty to any crime. Instead, all of his charges stemming from the home invasion were completely dismissed, albeit without prejudice. The prosecutor knew this testimony was false because she filed the motion to dismiss Leonard's case, which was granted nine months before defendant's trial. Defendant thus met his burden of proving Leonard's testimony was false, the prosecutor knew the testimony was false, and the trial court clearly erred in finding otherwise. See *Aceval*, 282 Mich App at 389.

Leonard's testimony on direct examination gave the misleading impression that he had already pleaded guilty in exchange for his testimony. The prosecutor began by asking if Leonard was involved in the home invasion on August 19, 2016, and Leonard confirmed that he was. The prosecutor then asked if he was charged with "that crime[,]" and Leonard responded, "Yes, I was charged with that crime and did time in jail." The prosecutor knew that Leonard did not do time in jail pursuant to any sentence for the home invasion. At this point, it appeared as though the prosecutor was going to clarify that Leonard had not, in fact, pleaded guilty to any crime, because the prosecutor began her next question, "But you have not—…," but then the prosecutor stopped and instead asked, "and in regards to you testifying today, there was a plea agreement that you would plead to a misdemeanor…." By using the phrase "would plead," the prosecutor very narrowly avoided eliciting false testimony because "would plead" could mean that Leonard had not actually pleaded guilty, but would do so at some point in the future. Leonard merely stated, "That's correct." While not outright false, this testimony certainly gave a misleading impression that Leonard had already pleaded guilty to a misdemeanor and served time in jail following his guilty plea.

Any ambiguity as to whether Leonard had actually pleaded guilty was clarified, albeit untruthfully, on cross-examination. Defense counsel asked, "But you did in fact plead to a misdemeanor; correct?" And Leonard responded, "Yes. I took the same plea that other people were offered." The prosecutor knew this was false because she had completely dismissed Leonard's case. This testimony triggered the prosecutor's duty to correct. *Smith*, 498 Mich at 477. The prosecutor did not seek to correct the testimony or raise any objection.

Having twice heard testimony regarding Leonard's plea agreement, the jury was under the impression that he had (1) pleaded guilty to a misdemeanor, and (2) spent some time in jail. But there was still ambiguity regarding whether Leonard "sat for six months" in jail on pretrial detention, or as part of a sentence for the misdemeanor conviction. This ambiguity was extinguished at the close of proofs when the trial court unequivocally instructed the jury: "Leonard Wilson has already been convicted of charges arising out of the commission of that crime. Leonard Wilson has been promised to receive—and has received a plea offer to a reduced charge for the crime that the Defendant is charged with committing…." The trial court further instructed, "You also heard testimony that Leonard Wilson served a six-month jail sentence per that agreement." These instructions were approved by both parties on the record on two occasions and read to the jury without objection.

The prosecutor thus had four opportunities to correct the false testimony that Leonard had pleaded guilty: on direct examination, on cross-examination, and the two instances when the trial court asked if there were any objections to the jury instructions. While Leonard's testimony on direct examination was not outright false, it was substantially misleading, and therefore the prosecutor had a duty to correct the misleading testimony. *Smith*, 498 Mich at 477. A prosecutor has an affirmative duty to correct false testimony, and this duty *specifically applies* when the testimony concerns remuneration, or compensation, for a witness's cooperation. *Id*. at 476. Leonard testified that he agreed to cooperate and testify for the prosecution in exchange for pleading guilty to a lesser charge. While not paid monetarily for his cooperation, Leonard was nonetheless rewarded with the opportunity to plead guilty to a lesser charge. And in reality, he was rewarded with a complete dismissal of all charges. Because the false testimony concerned Leonard's agreement to testify, the prosecutor had an affirmative duty to specifically correct his

testimony regarding that agreement. See *id*. Regardless of the prosecutor's intent to refile the charges against Leonard, at the time of trial, it was incorrect to state that he had already pleaded guilty.

There is furthermore a reasonable likelihood that the false testimony affected the judgment of the jury. See *Aceval*, 282 Mich App at 389. It was essential to the jury's determination of Leonard's credibility to know the facts surrounding his agreement to testify. After hearing that Leonard had already pleaded guilty and served a sentence for his involvement in the home invasion, the jury may have believed that Leonard did not have a motive to fabricate his testimony because he had already served his sentence. The jury may have given Leonard undue credibility based on the uncorrected false testimony.

The evidence at trial that implicated defendant consisted of the testimony of Kaitlyn and Leonard Wilson, and a photograph of defendant holding what appeared to be one of the stolen guns. Kaitlyn Wilson testified that the gun defendant was holding in the photograph was "one of the guns that was taken[,]" specifically, it was the gun she found in the bedside table during the home invasion. Kaitlyn believed defendant sent her the photo on Snapchat sometime "between March and June of 2017." The exact date the photo was taken was never established. The undersheriff for Oscoda County, Edward Pokrzywnicki, testified that he believed the gun defendant was holding was a Smith and Wesson model 5906. Pokrzywnicki based this conclusion on his experience in the Oscoda County Sheriff's Department, where he and others were issued the Smith and Wesson model 5906 as a service gun, including during the time Robert Boerner, the homeowner, was employed at the sheriff's department. Pokrzywnicki testified as a lay witness, not an expert witness. The gun was not introduced at trial and it is unclear whether it and the other two guns were ever recovered. Kaitlyn testified that Leonard kept one of the guns and she and defendant sold the other two guns to a drug dealer in Indiana.

As to Leonard's testimony, the jury heard a self-serving account of the home invasion in which Leonard apparently stayed out on the street, got cold feet, called defendant to tell him to leave, and began to walk home before Kaitlyn and defendant exited the home. Kaitlyn's credibility was at issue because she admitted she lied to the police and then changed her story. Kaitlyn initially implicated only herself and Leonard in the home invasion. After Kaitlyn was charged, arrested, and released from jail pursuant to a bond paid by her father, she implicated defendant. Kaitlyn testified that

> at first, I said it was all me and my dad, and then my dad bonded me out of jail and said that I had to stick with that story. When I met with Officer Haliin, I just felt the need to admit that it was all of us. My dad was kind of holding the fact that he posted my bail over my head, and I had to just say it was all just me and Stephan, but I didn't feel right saying it was just me and Stephan when it was all three of us, actually.

The jury could infer from this statement that Leonard wanted Kaitlyn to lie and say it was only her and defendant involved in the home invasion. Furthermore, Kaitlyn claimed that the home invasion was Leonard's idea, while Leonard claimed it was Kaitlyn's and defendant's idea. Considering the inconsistencies between Kaitlyn's and Leonard's testimony, the fact that Kaitlyn implicated defendant only after her father bonded her out of jail and encouraged her to implicate

defendant, and the fact that they both received no punishment for their involvement in the home invasion, the jury had a basis to question their credibility.

The prosecution has not met its burden to prove that there is no reasonable probability that the false testimony may have contributed to defendant's conviction. See *Anderson*, 446 Mich at 405-406. Jurors are presumed to follow the instructions they are given. *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020). The jurors were falsely instructed that Leonard was convicted and served a sentence for the home invasion. There is a reasonable likelihood this affected the outcome of trial because there was not overwhelming evidence of defendant's guilt presented at trial. The most damning physical evidence against defendant was the photo of him holding a gun that was presumably stolen during the home invasion. The outcome of the trial largely depended on the jury's assessment of the two main witnesses' credibility, which, as described above, was already in question before the false testimony was introduced.

There is a reasonable likelihood the prosecution's failure to correct the false testimony affected the judgment of the jury, and therefore violated defendant's right to due process.

## III. BRADY VIOLATIONS

Defendant asserts the prosecution suppressed the benefit Leonard received in exchange for testifying, and also suppressed Leonard's prior conviction for a crime of dishonesty, in violation of *Brady*. We agree.

## A. STANDARD OF REVIEW

This Court reviews a trial court's decision on a motion for a new trial for an abuse of discretion. *Rogers*, 335 Mich App at 191. Whether the prosecution violated *Brady* is a constitutional claim that this Court reviews de novo. *People v Burger*, 331 Mich App 504; 516; 953 NW2d 424 (2020).

## B. ANALYSIS

The suppression by the prosecution of evidence favorable to the accused violates due process when the evidence is material either to guilt or to punishment. *Brady*, 373 US at 87. "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *People v Dimambro*, 318 Mich App 204, 212-213; 897 NW2d 233 (2016), quoting *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014) (internal quotation marks omitted).

> To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. This standard does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.... The question is whether, in the absence of the suppressed evidence, the defendant received a fair trial,

understood as a trial resulting in a verdict worthy of confidence. In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. [*Id*. at 219 (quotation marks and citations omitted).]

"Crimes of dishonesty or false statement are directly probative of truthfulness, and are therefore admissible under MCR 609(a)(1) without consideration of the balancing test of MRE 609(a)(2)(B)." *People v Bartlett*, 197 Mich App 15, 19; 494 NW2d 776 (1992).

The trial court found that Leonard's "Agreement to Testify," which was provided to defense counsel before trial, was not a full statement of the purported plea agreement. However, the trial court found that defense counsel was informed prior to trial that Leonard's agreement to testify was based on a reduction from felony charges to a misdemeanor plea with jail. As the evidentiary hearing revealed, any prior understanding of the plea agreement on defense counsel's part was irrelevant because that agreement was never effectuated. The prosecutor admitted that she dismissed the charges against Leonard and failed to re-file them. Defense counsel testified that he did not know that Leonard's charges were dismissed. Therefore, it is clear the prosecution suppressed, either willfully or inadvertently, the fact that Leonard's case had been dismissed prior to trial. The trial court clearly erred in finding the prosecution did not suppress this evidence.

As to the crime of dishonesty conviction, the trial court concluded the prosecutor suppressed Leonard's conviction for false pretenses. But the trial court determined the suppression did not amount to a *Brady* violation because the evidence was not material. The trial court believed that Leonard's credibility was already damaged because he was once a co-defendant, had a reduction in his charges, and had a "self-preserving motive for testifying." Therefore, in light of the other evidence introduced at trial, the trial court did not believe that the result of the trial would have been different had the evidence been disclosed.

Both pieces of suppressed evidence were favorable to defendant because both the dismissal of Leonard's charges and his conviction for a crime of dishonesty would have been key impeachment evidence. *Dimambro*, 318 Mich App at 212-213. It was in both Kaitlyn's and Leonard's best interests to testify against defendant because all of their charges would be either reduced or dismissed, thus impeachment evidence would be very favorable to the defense.

As to the materiality of the evidence, the inquiry is very similar to that of uncorrected false testimony: "[t]he question is whether, in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. at 219. "In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal." *Id*. As stated above, without knowing the full extent of the benefit Leonard received for testifying, the jury may have given his testimony undue credit. According to the evidence presented, Leonard had already served a sentence for his involvement in the home invasion, thus it follows that the jury would believe he no longer had a reason to lie. Also, if presented with Leonard's recent conviction for false pretenses, the jury would have yet another sound reason to question Leonard's credibility.

To reiterate, the materiality standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's

acquittal...." *Id*. Rather, the question is whether the defendant received a fair trial "resulting in a verdict worthy of confidence." *Id*. In light of all the evidence, this Court cannot conclude that defendant's trial was fair. For the same reason the prosecution was required to disclose to the jury that Kaitlyn's charges had been dismissed for her testimony, the prosecution was also required to disclose that Leonard's charges had been dismissed. Agreements for testimony are relevant to assessing a witness's credibility. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue*, 360 US at 269. In a case that largely depended on the credibility of two former co-defendants, the jury was deprived of hearing two pieces of evidence that were highly probative of credibility.

The prosecution argues that disclosure of Leonard's crime of dishonesty would have had minimal impact on the jury's credibility determination because he was already impeached by being an accomplice witness. However, this Court must consider the suppressed evidence collectively in assessing its materiality. As defendant argues, the jury never learned that Leonard was not a credible witness in more ways than it knew. First, the jury never learned that Leonard lied on the stand when he said he had pleaded guilty to a misdemeanor. And second, the jury never learned that he had been convicted of false pretenses for lying to a third party regarding the sale of a vehicle only about a year and a half before defendant's trial. The suppressed evidence provided a basis for the defense to directly challenge Leonard's credibility. Consideration of both the suppressed dismissal of charges and the suppressed false pretenses conviction, in light of all the evidence presented at trial, shows that the evidence was material.

We find defendant's right to due process was violated by the prosecution's suppression of this evidence under *Brady*. The trial court abused its discretion in denying defendant's motion for a new trial based on the *Brady* violations.

IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his trial counsel was ineffective for failing to consult with defendant during jury selection, failing to challenge certain jurors for bias, failing to impeach witnesses, and failing to have defendant's mother testify in his defense. We disagree.

A. STANDARD OF REVIEW

A defendant must move for a new trial or an evidentiary hearing to preserve a claim of ineffective assistance of counsel. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Defendant did not move for a new trial or evidentiary hearing based on his claim of ineffective assistance of counsel. Therefore, this issue is unpreserved. This Court reviews unpreserved claims of ineffective assistance of counsel for errors apparent from the record. *Id*. See also *People v Hughes*, 339 Mich App 99, 105; 981 NW2d 182 (2021).

## B. ANALYSIS

The Sixth Amendment protects a defendant's right to effective assistance of counsel. US Const, Am VI; *Strickland v Washington*, 466 US 668, 685-686; 104 S Ct 2052; 80 L Ed 2d 674 (1984). A defendant must show (1) his counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "[A] defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Id*. at 52, citing *Strickland*, 466 US at 689. "[A]n attorney's decisions relating to the selection of jurors generally involve matters of trial strategy, which we normally decline to evaluate with the benefit of hindsight." *People v Johnson*, 245 Mich App 243, 259; 631 NW2d 1 (2001).

Defendant first claims that he did not participate in jury selection. This claim is without merit. Defendant was present in the courtroom during jury selection. On at least one occasion in the record, defense counsel indicated that he had told defendant he was going to ask a certain question to the jurors during voir dire. This indicates that defendant was consulted as to defense counsel's voir dire strategy prior to trial. Defendant also asserts that defense counsel did not participate in voir dire. This claim is also without merit. The trial transcript shows that defense counsel participated in voir dire, asked many questions of the potential jurors, and exercised three peremptory challenges pursuant to MCR 6.412(E).

Defendant next asserts that defense counsel was ineffective for failing to challenge three different jurors due to them being past victims of home invasions, and the potential bias this created. All three of the jurors defendant takes issue with had been past victims of home invasions. However, a significant amount of time had passed since these home invasions occurred; one was 30 years ago, one was in the late 1980s, and one was about 15 years ago. All three of these jurors were questioned about their feelings towards these incidents and assured the court that they could remain impartial. Defense counsel used a peremptory challenge to exclude a fourth juror who had been a victim of a home invasion about 12 years ago. And the trial court excluded a fifth juror who had been a victim of a home invasion in 2017 and indicated she was "still traumatized by it." Considering there were many jurors who were revealed to be past victims of home invasions, we cannot conclude that defense counsel was ineffective for failing to challenge those who indicated they would be impartial. Furthermore, jury selection is trial strategy which this Court declines to second-guess on appeal. See *Johnson*, 245 Mich App at 259.

Defendant also argues that defense counsel was ineffective for failing to question a juror about a potential conflict of interest. After the jury was empaneled and proofs began, the juror disclosed to the trial court that she knew Leonard Wilson, but did not recognize his name on the witness list because she knew him as Lenny. Leonard worked on the juror's house about four or five years ago and built a garage and porch. The trial court asked if she had any personal or social relationship with Leonard, and she said no. The juror also assured that she had not had any contact with Leonard since the work was done. The juror assured the trial court that she could be impartial. The trial court asked the prosecution and defense counsel if they had any issue with the juror remaining on the panel, and they both said no. Absent any other indication of bias, this Court cannot second-guess defense counsel's trial strategy as pertains to this juror. See *id*.

Defendant also argues defense counsel was ineffective for failing to impeach witnesses with their criminal record. Defendant concedes defense counsel introduced impeachment evidence in the form of Kaitlyn's prior inconsistent statement. But defendant does not specify what criminal record nor what witness should have been impeached. Defendant is most likely referring to Leonard's conviction for a crime of dishonesty. As explained above, the prosecution did not disclose Leonard's conviction for false pretenses to the defense. While defense counsel could have searched for this conviction on his own, we cannot say he was ineffective for failing to do so when it was not disclosed to him in discovery in violation of *Brady*.

Lastly, defendant argues that his mother could have testified on his behalf, and defense counsel was ineffective for not seeking her testimony. Defendant does not explain what his mother would have testified to. Accordingly, defendant has failed to establish a required factual predicate for this claim. See *People v Abcumby-Blair*, 335 Mich App 210, 235-236; 966 NW2d 437 (2020).

## V. CONCLUSION

The trial court abused its discretion in denying defendant's motion for a new trial. Defendant has not shown he received ineffective assistance of counsel. We vacate defendant's convictions and remand for a new trial. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Mark T. Boonstra
/s/ Brock A. Swartzle