*If this opinion indicates that it is "FOR PUBLICATION," it is subject to*
*revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

GEORGE STEPHEN CUNNINGHAM,

Defendant-Appellant.

UNPUBLISHED
March 09, 2026
10:49 AM

No. 364700
Chippewa Circuit Court
LC No. 19-003810-FC

Before: WALLACE, P.J., and GARRETT and ACKERMAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of first-degree child abuse, MCL 750.136b(2), armed robbery, MCL 750.529(1)(a), first-degree home invasion, MCL 750.110a(2), kidnapping, MCL 750.349, and five counts of unlawful imprisonment, MCL 750.349b. He was sentenced as a fourth-offense habitual offender, MCL 769.12, to concurrent terms of 375 months to 50 years' imprisonment for first-degree child abuse, 99 months to 50 years for armed robbery, 375 months to 50 years for kidnapping, and 228 months to 50 years for each unlawful-imprisonment conviction, followed by a consecutive term of 99 months to 50 years for home invasion.

On appeal, defendant challenges the trial court's personal and subject-matter jurisdiction, and he asserts that the prosecution violated the 180-day rule, MCL 780.131(1), and committed misconduct during his trial. Finding no errors, we affirm.

## I. BACKGROUND

This case arises out of an attempted kidnapping of defendant's biological son, ZC, by defendant and his codefendant, Jon Stygler. ZC was born in Malaysia to defendant and ZC's mother, a citizen of the Philippines. According to defendant's trial testimony, he brought ZC to the United States when ZC was 11 months old, even though ZC's mother had legal custody of the child under Philippine law. He agreed that, once in the United States, he was unable to care for ZC for a period of time. As a result, the child was placed in the care of defendant's sister and brother-in-law, Maria and Paul Quinn, who were ultimately granted custody of ZC in March 2017.

-1-

In February 2019, defendant visited ZC at the Quinn home. At the end of the visit, Maria and ZC walked defendant to his truck to say goodbye. Stygler then approached Maria and duct-taped her mouth while defendant zip-tied her hands and ankles and placed her in his truck. Defendant took a crying ZC into the house, where the child ran and hid. Defendant and Stygler then got into an altercation with Paul and other family members inside the home, which ended with defendant and Stygler zip-tying the family. During the struggle, one family member was able to call a friend for help; the friend called 911 and went to the residence, where he was able to assist Maria to safety. Defendant eventually found where ZC was hiding, carried the child outside, and left in his truck with ZC and Stygler.

Police officers followed tire tracks from the Quinn home toward Lake Superior, where they located the truck. They found sled tracks leading toward the lake and called for agents to bring snowmobiles and gear to head out onto the frozen lake. Officers ultimately located defendant, Stygler, and ZC about two miles offshore on the ice covering the lake. Police also recovered a black backpack that contained money, passports, and birth certificates. Although the child was in good condition when officers rescued him, various members of the Quinn family testified that, following the incident, ZC suffered nightmares and became afraid of male strangers, men with beards like defendant's, and cars. He also feared playing in the yard by himself.

After the presentation of evidence, the jury convicted defendant, and he was sentenced as described above. He now appeals.

## II. DISCUSSION

### A. JURISDICTION

Defendant first asserts that the prosecution lacked standing to bring the instant charges because ZC is not a United States citizen, and the trial court therefore lacked both personal and subject-matter jurisdiction. He contends that he preserved those claims of error by raising them in a pretrial motion to dismiss, but that motion challenged only the court's exercise of personal jurisdiction. See *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007) ("For an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court."). We therefore review the trial court's decision to deny the motion to dismiss based on personal jurisdiction for an abuse of discretion. *People v Witkoski*, 341 Mich App 54, 59; 988 NW2d 790 (2022). "An abuse of discretion occurs when the trial court's outcome falls outside the range of reasonable and principled outcomes." *People v Meeker (On Remand)*, 340 Mich App 559, 563; 986 NW2d 622 (2022).

We review defendant's unpreserved subject-matter-jurisdiction and standing challenges for plain error affecting substantial rights. *People v Swenor*, 336 Mich App 550, 562, 564; 971 NW2d 33 (2021). Under that rule, "defendant bears the burden to prove (1) an error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights, i.e., prejudiced defendant by affecting the outcome of the proceedings." *People v Anderson*, 341 Mich App 272, 279; 989 NW2d 832 (2022) (cleaned up). Reversal is warranted only when "the plain error seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of defendant's innocence." *Id*. at 280. We review de novo whether a trial court has subject-matter and personal jurisdiction, *In re Contempt of Pavlos-Hackney*, 343 Mich App 642,

667; 997 NW2d 511 (2022), and whether a party has standing, *People v Sledge*, 312 Mich App 516, 524; 879 NW2d 884 (2015).

Regarding standing, defendant relies on federal caselaw discussing standing in the civil context, which requires a plaintiff to demonstrate that he or she has suffered an injury-in-fact, a causal connection between the injury and the conduct complained of, and that a favorable decision would likely provide redress. See, e.g., *Lujan v Defenders of Wildlife*, 504 US 555, 560-561; 112 S Ct 2130; 119 L Ed 2d 351 (1992). He asserts that the prosecution here lacked standing to bring the charges because: (1) the "injury-in-fact" occurred when ZC was first taken into state custody, purportedly in violation of his mother's legal custody; (2) there was no causal connection between that injury-in-fact and the charges brought; and (3) a decision favorable to the prosecution did not provide redress because, despite defendant's conviction, ZC continues to suffer harm due to his wrongful removal from his mother. As a result, defendant argues, the trial court lacked subject-matter and personal jurisdiction.

Those arguments are predicated on a misunderstanding of the applicable law. In the criminal context, "[t]o have standing, a party must have a legally protected interest that is in jeopardy of being adversely affected." *Sledge*, 312 Mich App at 525 (citation omitted). More generally, "a litigant has standing whenever there is a legal cause of action," including when standing is conferred by statute. *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372; 792 NW2d 686 (2010). The Michigan Constitution requires "each organized county" to elect a prosecutor "whose duties and powers shall be provided by law." Const 1963, art VII, § 4. Under MCL 49.153, "prosecuting attorneys shall, in their respective counties, appear for the state or county, and prosecute or defend in all the courts of the county, all prosecutions, suits, applications and motions whether civil or criminal, in which the state or county may be a party or interested." Pursuant to that statute, "prosecuting attorneys in Michigan possess broad discretion to investigate criminal wrongdoing, determine which applicable charges a defendant should face, and initiate and conduct criminal proceedings." *Fieger v Cox*, 274 Mich App 449, 466; 734 NW2d 602 (2007). Accordingly, the prosecution has standing granted by law to prosecute criminal allegations, and defendant's standing argument is unavailing.

We are similarly unpersuaded by defendant's challenges to the court's exercise of jurisdiction. Personal jurisdiction "deals with the authority of the court over particular persons," while subject-matter jurisdiction "concerns a court's abstract power to try a case of the kind or character of the one pending and is not dependent on the particular facts of the case." *People v Lown*, 488 Mich 242, 268; 794 NW2d 9 (2011) (quotation marks and citation omitted). The trial court here had personal jurisdiction over defendant because he was bound over for trial following a preliminary examination. See *People v Goecke*, 457 Mich 442, 458; 579 NW2d 868 (1998). And the trial court properly exercised subject-matter jurisdiction over the case because Michigan circuit courts have subject-matter jurisdiction over felony criminal cases, Const 1963, art 6, § 13; MCL 767.1, and defendant was charged with multiple felonies. He therefore has not established error with respect to the trial court's exercise of jurisdiction.

B. SPEEDY TRIAL

Before trial, defendant moved the trial court to dismiss the charges for a purported violation of his right to a speedy trial. The trial court denied the motion, and defendant now challenges that

decision. We review de novo whether a defendant was denied the right to a speedy trial. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006). We review for clear error the trial court's factual findings underlying its decision on the motion. *Id*.

"Both the United States Constitution and the Michigan Constitution guarantee a criminal defendant the right to a speedy trial." *Id*. at 261, citing US Const, Am VI; Const 1963, art 1, § 20. "The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *Williams*, 475 Mich at 261. "[A] defendant's right to a speedy trial is not violated after a fixed number of days." *Id*. Rather, to determine whether a defendant has been denied his speedy-trial right, we must balance "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id*. at 261-262. Those factors "have no talismanic qualities" and should be considered in the context of the other circumstances of the case. *People v Collins*, 388 Mich 680, 695; 202 NW2d 769 (1972) (citation omitted).

In this case, defendant's trial began 29 months after his arrest. Because the delay exceeded 18 months, it is presumptively prejudicial, and we must consider the other factors to determine whether defendant was denied his right to a speedy trial. See *Williams*, 475 Mich at 262.

Concerning the reason for delay, "courts may consider which portions of the delay were attributable to each party when determining whether a defendant's speedy trial rights have been violated and may attribute unexplained delays—or inexcusable delays caused by the court—to the prosecution." *Lown*, 488 Mich at 261-262. But "delays caused by the COVID-19 pandemic are not attributable to the prosecution for purposes of a speedy-trial claim." *People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 5.

Here, trial was initially scheduled for September 2019. Defendant moved the trial court to adjourn the trial date so that counsel could review discovery materials, and the prosecution objected to the adjournment, representing that it was prepared to proceed to trial as scheduled. The court granted the adjournment and rescheduled the trial for May 2020 but indicated that the associated delay would be attributed to defendant. In April 2020, however, the trial was adjourned due to the COVID-19 pandemic, which continued to necessitate adjournments until the case was finally tried in August 2021. Thus, the delay was attributable to defendant's request for an adjournment and the COVID-19 pandemic, which is not attributable to any particular party, and the reason for delay therefore weighs against defendant.

Regarding the third factor, defendant first asserted his speedy-trial right in December 2019. Such a timely assertion generally weighs in favor of a defendant. *Williams*, 475 Mich at 261-262. In this case, however, defendant asserted his speedy-trial right after trial was adjourned at defense counsel's request but before the onset of the pandemic, an event no one could have anticipated. We therefore afford this factor little weight.

With respect to the fourth factor, the *Smith* Court explained that there are

> two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to his defense. Pretrial incarceration necessarily results in a degree of prejudice to the person. And while anxiety caused by a lengthy delay can

occur, anxiety alone cannot establish a speedy-trial violation. [*Smith*, ___ Mich App at ___; slip op at 6 (quotation marks, citations, and alterations omitted).]

Regarding a speedy-trial claim, "impairment of defense is the most serious form of prejudice . . . because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id*. (quotation marks and citation omitted). Accordingly, "a reviewing court should look for examples about how the delay between arrest and trial harmed the defendant's ability to defend against the charges." *Id*.

The delay in this case exceeded 18 months, and we therefore presume that defendant suffered some resultant personal prejudice. However, he has not established prejudice to his defense. He contends that his defense was prejudiced because, as a result of the delay, he decided to terminate the representation of his public defender. But when he moved the trial court to terminate the public defender, he asserted that the public defender had "obstructed justice" by refusing to file an exhibit list containing defendant's requested exhibits. The record therefore does not support the claim that defendant terminated the public defender because of the delay; rather, it demonstrates that he terminated the public defender because he did not agree with that attorney's strategic decisions. And because we can discern no other prejudice to the defense resulting from the delay, this factor favors the prosecution.

On balance, the factors set forth in *Williams* weigh against finding a speedy-trial violation. Accordingly, defendant has not established that the trial court erred by denying his motion to dismiss on that basis.

## C. PROSECUTORIAL MISCONDUCT

Defendant finally argues that the prosecutor committed misconduct by suppressing exculpatory evidence and failing to correct perjured testimony at trial. We review that unpreserved claim for plain error affecting substantial rights. *People v Isrow*, 339 Mich App 522, 529; 984 NW2d 528 (2021).

"[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). Because the use of false testimony by a prosecutor violates a defendant's due-process rights, *People v Brown*, 506 Mich 440, 446; 958 NW2d 60 (2020), the prosecution may not knowingly present false testimony, nor may it take advantage of false testimony to obtain a conviction, *People v Smith*, 498 Mich 466, 475-476; 870 NW2d 299 (2015). Further, the prosecutor must give the defendant any favorable evidence that is material to guilt or punishment. *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). A prosecutor violates a defendant's due-process rights if the prosecutor, in bad faith, failed to preserve material evidence that might have exonerated the defendant. *Arizona v Youngblood*, 488 US 51, 57-58; 109 S Ct 333; 102 L Ed 2d 281 (1988).

Defendant asserts that the prosecution offered perjured testimony from Paul that the Quinns had not yet initiated proceedings to adopt ZC because ZC's mother did not agree to an adoption. In support of his assertion that Paul's testimony was false, defendant points to his own trial testimony that he had filed a motion in the circuit court to stay adoption proceedings pertaining to ZC. But conflicting witness testimony creates an issue of credibility, which is a determination for

the jury. See *People v Lemmon*, 456 Mich 625, 642-643; 576 NW2d 129 (1998). Standing alone, defendant's testimony establishes only a credibility question; it does not establish that Paul's testimony was false. Defendant therefore has not established that the prosecutor erred by presenting that testimony.

The remainder of defendant's prosecutorial-misconduct arguments concern ZC's birth certificate, which law enforcement recovered from the backpack seized at the time of defendant's arrest. At trial, the prosecution presented the testimony of a detective who averred that the Quinns reached out to law enforcement before trial to request the return of ZC's original birth certificate from the police evidence vault so that they could renew his passport. The detective received authorization from the prosecutor's office to release the original document to the Quinns, and he made a copy of the birth certificate to retain in evidence before he gave the Quinns the original. The copy was admitted at trial.

On appeal, defendant asserts that the detective's testimony regarding the birth certificate was false and that the prosecution committed misconduct by eliciting that testimony, but he does not identify any specific falsehood. Nor does he articulate how the purportedly false testimony deprived him of his right to a fair and impartial trial. He has therefore abandoned that claim of error. See *People v Iannucci*, 314 Mich App 542, 545; 887 NW2d 817 (2016) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority.") (citation omitted).

Defendant also argues that, by authorizing the return of the original birth certificate to the Quinns, the prosecution impermissibly suppressed exculpatory evidence. To establish a *Brady* violation, a defendant must demonstrate that: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id*. "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. (quotation marks and citation omitted).

Defendant has not established that the original birth certificate was material or exculpatory. He testified at trial that the birth certificate was important because, if he had been able to get ZC to the Philippine Embassy, ZC would have been granted asylum as a Philippine national, and he would have been returned to his mother. But that has no bearing on whether defendant committed the charged offenses. On appeal, he primarily focuses on the effect of the birth certificate as it relates to the adoption proceedings, but he does not identify how that evidence was material to the instant case. Defendant has therefore abandoned this claim of error. See *Iannucci*, 314 Mich App at 545. Moreover, it is undisputed that a copy of the birth certificate was admitted into evidence.

Absent a showing that the original birth certificate was in some way material or exculpatory, defendant cannot establish that the prosecution improperly suppressed that evidence.[1]

Affirmed.

/s/ Randy J. Wallace
/s/ Kristina Robinson Garrett
/s/ Matthew S. Ackerman

---

[1] In the argument section of his brief on appeal, defendant additionally asserts that the prosecution presented insufficient evidence to support his conviction of first-degree child abuse and that he was denied his right to an impartial jury drawn from a cross section of the community. "To the extent that these statements might be interpreted as additional claims of error, defendant has abandoned them by failing to identify them in his statement of the questions presented . . . ." *People v Haynes*, 338 Mich App 392, 435 n 5; 980 NW2d 66 (2021).